TERRI F. LOVE, Judge.
11 This appeal arises from a trial on the merits for the four class representatives in a class action proceeding resulting from injuries caused from exposure to carbide lime dust. Following a two-week bench trial, the trial court allocated fault amongst the defendants pursuant to multiple theories of recovery and awarded damages to each class representative. The defendants and their insurers alleged that the trial court erred regarding the right to a jury trial, the admission of an expert’s testimony, medical causation, an award to a class representative for scarring, class decertifi-cation, class redefinition, retaining operational control of an independent contractor, the imposition of garde liability to the landowner, a finding of La. C.C. art. 667 liability. The defendants contend the claims of each individual class member do not constitute a separate accident or occurrence per policy period. They also assert the class certification renders the application of Lombard v. Sewerage and Water *19 Bd. of New Orleans, 284 So.2d 905 (La.1973) and its progeny erroneous in this case. The defendants additionally aver the 12trial court erroneously found that the non-cumulation coverage provisions conflict with the “exposure theory” adopted by Louisiana courts and were therefore unenforceable.
We find that the parties were not entitled to a trial by jury, that the trial court did not abuse its discretion in admitting the expert’s trial testimony, or err in finding medical causation. We also find that the trial court did not abuse its discretion in awarding a class representative $23,000 for scarring. The trial court also did abuse its discretion in denying the motion to decertify the class or err in redefining the class or denying the defendants’ motion to decertify the class. We also find that the property owner retained operational control over its independent contractor, which was paid to remove the carbide lime. We also find that the trial court correctly imposed garde liability and La. C.C. art. 667 liability on the property owner. Lastly, we find the trial court accurately applied Lombard and its progeny and appropriately found an occurrence to each class member involving continuous or repeated exposure to carbide lime over a period of time, specifically between July 2004 and December 2004. Additionally, we find there is no legal basis for this Court to create a mechanism by which a class of injured plaintiffs can be or should be treated differently from individual plaintiffs. We also find that the non-cu-mulation/anti-stacking provision in the Commerce and Industry Insurance Company policies are ineffective in this case because it affects non-existent aggregate limits, not per occurrence limits. Based upon our review, we hold the policies issued by Chartis and Commerce and Industry Insurance Company for the July 2004 through December 2004 period are effective and shall provide primary coverage.

\nFACTUAL BACKGROUND AND PROCEDURAL HISTORY

This Court recited some of the pertinent facts of the case sub judice while reviewing the previous appeal of the class certification as follows:
Air Liquide America operated a facility at 6600 Old Gentilly Road, in eastern New Orleans. The company manufactured and bottled acetylene from the 1980’s until it ceased operations sometime in the 1990’s. As part of its operation, Air Liquide stored carbide lime, a by-product of the acetylene manufacturing process, in an on-site impoundment area, also known as a “sludge pond.” Carbide lime contains calcium hydroxide, which at sufficient levels of exposure can potentially cause irritation to the respiratory, digestive and visual system. The Air Liquide facility remained dormant from the 1990’s until 2003 when Air Liquide contracted with Global Lime to remove the approximately 31,000 cubic yards of carbide lime from the im-poundment area. The actual removal process began on September 15, 2003, and continued until some time in 2004. The removal process involved excavating and transporting the carbide lime by truck from Air Liquide to another disposal site. This removal process is what triggered the instant litigation.
Plaintiffs, either persons who resided near the facility or persons who worked in the area of the facility, claimed generally that in the course of the plant operation, carbide lime dust became airborne and drifted into the surrounding neighborhood. Additionally, once the removal process began, the trucks used to transport the carbide lime further dispersed dust into the air causing it to be deposit *20 ed in the surrounding neighborhood. Plaintiffs filed suit on 6/28/05.
Defendants named in the original petition were Air Liquide-Big Three, Inc., f/k/a Lincoln Big Three, Inc., Air Liq-uide America Corporation, Air Liquide America L.P. (collectively referred to as “Air Liquide”), Global Lime Calciner of Louisiana, LLC, Global Lime, LLC (collectively referred to as “Global Lime”), David Bergeron, and E. Roy Baggett, d/b/a RBCHMM.
Marshall ex rel. minor children v. Air Liquide-Big Three, Inc., 08-0668, pp. 1-2 (La.App. 4 Cir. 12/17/08), 2 So.3d 541, 544.
In plaintiffs’ First Supplemental and Amending Petition ... defendants American International Specialty Lines, | Commerce & Industry Insurance, ACE American Insurance Company, ACE Property and Casualty Insurance Company, Highlands Insurance Company, National Union Fire Insurance Company, Pacific Employers Insurance Company, J & B Trucking of Cameron, L.L.C., d/b/a J & B Trucking, ABC Company (an unknown trucking company), and Three C’s Properties, Inc., were added.
Marshall, 08-0668, p. 2, 2 So.3d at 544-45.[1]
Following the trial court’s subsequent hearing on class certification, the trial court granted the motion to certify the class and defined the class as:
Any person, including named plaintiffs and their minor children, who resided or regularly worked within a one-mile radius of the Air Liquide America Facility located at 6600 Old Gentilly Road, New Orleans, Louisiana between September 2003 and the end of 2004, and who may have been exposed to calcium hydroxide coming from the Air Liquide facility.
Marshall, 08-0668, p. 3, 2 So.3d at 545.
Air Liquide-Big Three, Inc. f/k/a Lincoln Big Three, Inc. and Air Liquide America L.P. f/k/a Air Liquide America Corporation (“AL”) signed a contract with Global Lime Calciner of Louisiana, LLC, Global Lime, LLC (“GL”) to remove the carbide lime[2] on AL’s site for $10 allegedly because GL sought to gain from selling the reprocessed carbide lime. A reclamation plan and a closure plan for the AL site were prepared by an environmental consultant, E. Roy Baggett and his company, RBCHMM. Both the reclamation plan and the closure plan were approved by the Louisiana Department of Environmental Quality (“LDEQ”) and provided that the carbide lime would be removed from AL’s site by converting the carbide lime into a liquid slurry and pumping it into enclosed tanker trucks, which is a technique called hydromining. The carbide lime would then be transported to |sa barge docked in the Intercoastal Waterway. However, during the removal project, hydromining was abandoned allegedly because the process was too time-consuming. An excavator was then used to dig out the carbide lime and place it into piles to dry out. Once drier, the carbide lime was placed into dump trucks and hauled to the barge in contravention of the reclamation plan approved by the LDEQ.
After the trial court’s class certification, this Court’s affirmation, and the Louisiana Supreme Court’s writ denial,[3] this matter *21 was set to proceed as a bench trial on the merits of the claims of the four class representatives, Michelle Marshall (“Miss Marshall”), Dorothy Jones, Tina Andrews and Jim Adams,[4] (collectively referred to as the “class representatives”),[5] who alleged that the carbide lime dust created by the removal project caused them to suffer various medical problems, including respiratory system issues, sinus cavity complications, and various skin rashes.
The class representatives averred that AL; GL; Chartis Specialty Insurance Company f/k/a American International Surplus Lines Insurance Company (“Char-tis”), as an alleged insurer of AL and GL; Commerce and Industry Insurance Company (“C & I”), as an alleged insurer of AL and GL; ACE American Insurance Company (“ACE1”), an alleged insurer; ACE Property and Casualty Insurance Company (“ACE2”), an alleged insurer; and Pacific Employers Insurance Company (“Pacific”) were liable for their injuries.
1 fiPrior to trial, the trial court issued several case management orders stating that the trial on the merits would proceed as a bench trial. On April 26, 2010, AL filed a motion for leave to file a third amended and supplemental cross-claim substituting C & I for ABC Insurance Company, which was granted. Two days later, the trial court issued a scheduling order for trial, which stated that the trial would proceed as a bench trial. On May 18, 2010, AL requested a trial by jury after Three C’s Properties, Inc.[6] (“Three C’s”), a fellow defendant of AL and GL, dismissed its third party demand against Republic Vanguard Insurance Company (“Republic”), who previously requested a jury trial.[7] AL’s request for a jury trial was denied on May 25, 2010, as untimely filed.[8] On June 25, 2010, AL filed a second request for a trial by jury based upon the trial court’s signing the final judgment on June 15, 2010, which dismissed Republic from the litigation. The trial court denied the request. No party paid the jury bond by the timeline set forth in the jury trial order created upon Republic’s request.
On July 17, 2010, C & I filed an answer and request for a jury trial based upon AL’s third amended and supplemental cross-claim. Following a hearing, the trial court struck AL’s third amended and supplemental cross-claim and C & I’s answer and request for a jury trial from the record on July 23, 2010. The trial court then found C & I’s request for a jury trial moot. Accordingly, a bench trial commenced.
During the two-week bench trial on the merits, Mr. Baggett made a motion for involuntary dismissal with prejudice. The trial court granted Mr. Baggett’s motion, dismissing him from the litigation. After the close of the trial, AL, |7Chartis, C & I, ACE1, ACE2, and Pacific filed a motion to decertify the class and dismiss or, alternatively, to amend the class definition.
*22 The trial court’s judgment granted the motion to decertify in part by amending the class definition. The trial court decreased the time period in the class definition from September 15, 2003-December 31, 2004, to July 21, 2004-December 31, 2004. The trial court also dismissed with prejudice all property damage claims regarding the class representatives and again stated that Mr. Baggett was not a fault, dismissing him with prejudice. The trial court found for the class representatives as follows:
Michelle Marshall $27,250
Dorothy Jones $ 1,750
Tina Andrews $ 1,750
Jim Adams $ 500
In addition to the individualized awards, the trial court awarded $3,500 to each class representative for their representation of the class. The trial court found AL liable for 100% of the fault alleged pursuant to La. C.C. art. 667. As to liability alleged pursuant to La. C.C. art. 2315, 2316, 2317, and 2317.1, the trial court assessed AL with 25% liability and GL with 70% liability. The trial court found that AL had no liability with respect to La. C.C. art. 2322.
In regards to the insurance policies, the trial court held that ACE1 was listed as the excess insurance policy and that a $2 million deductible must be satisfied before its insurance policy is triggered. Additionally, the ACE1 policy would not be triggered until the Chartis and C & I policies’ maximum limits are reached. Further, the trial court held that Chartis’ Commercial General Liability (“CGL”) and Pollution Legal Liability Policies (EG 377-9992 and EG 150-6777) and C & I’s Business Auto Policy (CA 505-37-53) were triggered, which required coverage. |sAs to the Chartis policies, “each of the plaintiffs’ representatives’ claims are considered an ‘occurrence.’ ” “As such, plaintiffs are permitted for future class action litigation to claim up to $4 million (the aggregate limits) from the two applicable” Chartis “policies falling within the amended class definition period.” The trial court also held that the plaintiffs were permitted for future class action litigation to claim up to $2 million (the aggregate limits) from the two applicable C & I policies.” Lastly, the trial court found that the anti-stacking/non-cumulation policies were unenforceable under Louisiana law and that no pollution exclusion applied.
Multiple motions for new trial were filed regarding varying issues. After due consideration, the trial court issued a second judgment stating that it “reiterated and adopted in full,” the previous judgment “except as to the issues raised by the aforementioned Motion to Amend and Motions for New Trial.”
In the second judgment, the trial court first held that Chartis’, C & I’s, GL’s, and AL’s motion for new trial was granted and found that David Bergeron was not at fault, dismissing him with prejudice. Second, C & I’s, GL’s, and AL’s motion for new trial was granted and five percent of the fault for the class representatives’ La. C.C. art. 2315, 2316, 2317 and 2317.1 claims was allocated to parties other than Chartis, C & I, GL, AL, Mr. Bergeron and/or Mr. Baggett. Third, the class representatives’, Chartis’, C & I’s, GL’s, and AL’s motion for new trial was granted in that Chartis CGL and Pollution Legal Liability Policies (EG 377-9992 and EG 150-6777) and the: C & I Business Auto Policies (CA 505-37-53) were triggered requiring coverage.
[ Ujnder the AISLIC policies, each of the plaintiffs’ representatives’ claims are considered an “occurrence” and/or “accident” and, as such, class members and/or |flplaintiffs are permitted for future class action purposes to claim up to $4 million (the aggregate limits) from the two applicable AISLIC policies fall *23 ing within the amended class definition period.
“[ I]n addition, class members and/or plaintiffs are permitted for future class action purposes to claim up to $1 million per accident from each of the two applicable C & I policies.” Fourth, Chartis’, C & I’s, GL’s, and AL’s motion to amend was granted because Robert E. Kerrigan, Jr. and Jonathan M. Walsh appeared at the trial and/or the motion to decertify the class on behalf of Chartis, in their capacity as the alleged insurers of GL. Fifth, the trial court granted the class representatives’ motion for new trial regarding judicial interest and awarded interest from the date of judicial demand. Sixth, ACE2, Pacific, and ACEl’s motion to incorporate portions of the written reasons for judgment into the judgment was granted.[9] The trial court dismissed the following ACE2 and Pacific insurance policies from litigation:
CIGNA Property & Casualty Insurance Company policy number HDO G18959604 (issued 6/1/96-6/1/97); Pacific Employers Insurance Company policy number HDO G19324369 (issued 6/1/98— 6/1/99); Pacific Employers Insurance Company policy number HDO G19889403 (issued 6/1/99-6/1/00 and renewed 6/1/00-6/1/01); and Pacific Employers Insurance Company policy number HDO G20589127 (issued 6/1/02-6/1/03).
Seventh, the trial court dismissed the ACE1 insurance policy HDO G20591559, effective 6/1/03-6/1/04, from the litigation, which left policy HDO G20591912 (issued 6/1/04-6/1/05) at issue. Eighth, the trial court ordered that the ACE1 policy HDO G20591912 listed as the excess insurance policy and that a $2,000,000 “deductible per-occurrenee must be satisfied as to each claimant in the | inlitigation before its insurance policy is triggered.” This ACE1 policy would not be triggered until the Chartis and C & I policies’ maximum limits were reached. Lastly, the trial court clarified that the amount awarded to each class representative for his/her representation was not rendered against ACE1.
After a separate hearing, the trial court also ordered and set the taxable costs to Chartis and C & I, as the alleged insurers of GL and AL at $51,895.77.
Chartis, C & I, (both in their alleged capacity as insurers of GL and AL) and AL’s motion for suspensive appeal timely followed. ACE1 subsequently filed a timely motion for a devolutive appeal. Subsequently, Chartis and C & I, as alleged insurers of GL and AL[10] filed a motion for a suspensive appeal from the trial court’s judgment that set taxable costs.[11]
Chartis and C & I, as the alleged insurers of GL, assert that the trial court: 1) abused its discretion by refusing to redefine the class to exclude people who “regularly worked” within the class zone and by not reducing the class zone to one-quarter mile, 2) committed manifest error in awarding medical damages to the class *24 representatives, 3) committed manifest error in its $23,000 award to Miss Marshall, 4) abused its discretion by accepting the trial testimony of Dr. William Zegel, 5) erred by refusing to decertify the class, and 6) by conducting a bench trial.
AL contends that the trial court: 1) erred in imposing liability pursuant to La. C.C. art. 2315 and 2316 because it did not retain “operational control” over GL as its independent contractor, 2) erred in imposing garde liability because title to the carbide lime passed to GL, 3) erred in imposing liability pursuant to La. C.C. art. |, ,667 because the record lacks evidence that the class representatives’ alleged injuries resulted from AL’s operation of its property, 4) that the damages awarded pursuant to La. C.C. art. 667 were duplicative, and 5) erred in twice denying AL’s request for a jury trial.
Chartis & C & I, as the alleged insurers of AL, aver that the trial court: 1) erred in holding that each individual class member’s claims constituted a separate accident under the C & I policies, 2) erred in holding that each individual class member’s claims constitute a separate occurrence under the Chartis policies, and 3) erred in holding that the “non-cumulation” provisions contained in the C & I policies are unenforceable. Chartis and C & I, as the alleged insurers of AL, also incorporated issues one — five from the appellant brief regarding GL and issues one — four from AL’s appellant brief.
ACE1, as an alleged insurer of AL, asserts that the trial court: 1) erred in imposing liability upon AL pursuant to La. C.C. art. 2315 and 2316 because it did not retain “operational control” over GL as its independent contractor, 2) erred in imposing garde liability because title to the carbide lime allegedly passed to GL, 3) erred in imposing liability pursuant to La. C.C. art. 667 because the record allegedly lacks evidence that the class representatives’ alleged injuries resulted from AL’s operation of its property, 4) that the damages awarded pursuant to La. C.C. art. 667 were duplicative and resulted in “an impermissible double recovery,” 5) erred by refusing to redefine the class to exclude people working in the class zone and not reducing the class zone to one-quarter mile, 6) committed manifest error in awarding medical damages to the class representatives, 7) committed manifest error in its $23,000 award to Miss Marshall, 8) abused its discretion by accepting the trial testimony of Dr. William Zegel, and 9) erred by refusing to |,2decertify the class.

STANDARD OF REVIEW

Appellate courts review factual findings utilizing the manifestly erroneous/clearly wrong standard of review. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). “In order to reverse a fact finder’s determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous.” Cosby v. Holcomb Trucking, Inc., 05-0470, pp. 12-13 (La.9/6/06), 942 So.2d 471, 479. “The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently.” Cosby, 05-0470, p. 13, 942 So.2d at 479.
When a trial court’s factual findings “are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings.” Rosell, 549 So.2d at 844. “[Ojnly the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s under *25 standing and belief in what is said.” Id. “[W]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Id.
“However, where documents or objective evidence so contradict the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination.” Cosby, 05-0470, p. 13, 942 So.2d at 479. “[Wjhere such factors are not present, and a fact | ^finder's finding is based on its decision to credit the testimony of one or two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.” Id.
Legal questions and issues are reviewed with the de novo standard of review. Fornerette v. Ward, 10-1219, p. 5 (La.App. 4 Cir. 5/11/11), 66 So.3d 516, 520. The trial court’s legal conclusions are “not entitled to deference.” Cawley v. Nat’l Fire & Marine Ins. Co., 10-2095, p. 3 (La.App. 1 Cir. 5/6/11), 65 So.3d 235, 237.
The trial court is vested with many vastly discretionary powers, which are therefore entitled to the abuse of discretion standard of review on appeal. Awards for general damages are reviewed for an abuse of discretion. Bouquet v. Wal-Mart Stores, Inc., 08-0309, p. 4 (La.4/4/08), 979 So.2d 456, 459. Trial court holdings regarding class decertification and the admission of expert testimony are also reviewed looking for an abuse of discretion. See Orrill v. Louisiana Citizens Fair Plan, 11-1541, p. 1 (La.App. 4 Cir. 6/13/12), 96 So.3d 647, 648; Versluis v. Gulf Coast Transit Co., 08-0729, p. 6 (La.App. 4 Cir. 7/29/09), 17 So.3d 459, 463.

JURY TRIAL

AL, Chartis, and C & I[12] contend that the trial court erred by denying their right to a jury trial.[13]
The trial court completed numerous case management orders stating that the trial on the merits would proceed as a bench trial. On April 26, 2010, AL filed a motion for leave to file a third amended and supplemental cross-claim to substitute C & I for ABC Insurance Company, which was granted. Two days later, the trial 114court wrote a scheduling order for trial, which stated that the trial would proceed as a bench trial. On May 18, 2010, AL requested a trial by jury after Three C’s, dismissed its third party demand against Republic, who previously requested a jury trial. AL’s request for a jury trial was denied on May 25, 2010, as untimely filed.[14] AL filed a second request for a trial by jury based upon the trial court’s signing the final judgment on June 15, 2010, which formally dismissed Republic from the litigation. The trial court denied the request. No party paid the jury bond by the time-line set forth in the jury trial order created upon Republic’s request.
On July 17, 2010, C & I filed an answer to AL’s amended pleading and requested a jury trial. Following a hearing, the trial court struck AL’s pleading and C & I’s answer and request for a jury trial from the record on July 23, 2010. The trial *26 court then found C & I’s request for a jury-trial moot.
AL alleges that it timely requested a jury trial twice, pursuant to La. C.C.P. art. 1733(C), which provides that “[t]he pleading demanding a trial by jury shall be filed not later than ten days after either the service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury.” AL avers that the first request for a jury trial on May 18, 2010, was timely because it filed a jury request and paid the jury bond within ten days of Three C’s dismissing a third party demand against Republic. However, the judgment dismissing Republic was unsigned by the trial court at that time and the trial court denied the request. AL’s first denial of a jury trial was reviewed by this Court in its supervisory capacity. AL’s application for supervisory review was denied by 'this Court and the Louisiana Supreme Court. Marshall v. Air Liquide-Big Three Inc., 10-0777 (La.App. 4 Cir. 8/10/10), writ denied, 10-CC-1958 (La.8/26/10), 42 So.3d 407. AL filed a second request for a jury trial and posted the jury bond on June 25, 2010, after learning that the trial court signed the order dismissing Republic on June 15, 2010. The trial court denied AL’s second request.[15]
Pursuant to La. C.C.P. art. 1733(A), “A party may obtain a jury trial by filing a pleading demanding a trial by jury and a bond in the amount and within the time set by the court pursuant to Article 1734.” Such a demand must be “filed not later than ten days after either service of the last pleading directed to any issue triable by a jury, or the granting of a motion to withdraw a demand for a trial by jury.” La. C.C.P. art. 1733(C). Pursuant to La. C.C.P. art. 1734(A), “when the case has been set for trial, the court shall fix the amount of the bond to cover all costs ... and shall fix the time for filing the bond, which shall be no later than sixty days prior to trial.”
The right to a jury in a civil trial is not constitutionally mandated. Riddle v. Bickford, 00-2408, p. 5 (La.5/15/01), 785 So.2d 795, 799. If a “jury trial is not timely requested or sufficient bond not timely filed, the litigant loses the statutory right to a jury trial.” Riddle, 00-2408 at p. 7, 785 So.2d at 799, citing Hall v. K-Mart, 99-0619 (La.App. 4 Cir. 3/1/00), 755 So.2d 1020 (untimely jury request), also citing Littleton v. Wal-Mart Stores, Inc., 99-390 (La.App. 3 Cir. 12/01/99), 747 So.2d 701 (untimely cash deposit).
Comment b, from the 1983 comments, to La. C.C.P. art. 1733 states that “Paragraph C protects the rights of a party who has relied upon another party’s 11Rdemand [sic] trial by jury by providing a reasonable time after the demand is withdrawn for such a party to file his own demand.” (Emphasis added). This Court concluded that the failure to furnish the jury bond [ordered by the trial court] constitutes a waiver of the right to a trial by jury. Palumbo v. Phillips, 504 So.2d 629, 631 (La.App. 4th Cir.1987).
A jury trial order issued on September 8, 2009, ordering a jury bond to be posted sixty days prior to an original trial date of May 17, 2010, or March 18, 2010, which was later continued. However, AL asserts that La. C.C.P. art. 1733(C) permits them to revive their right to jury trial after dismissal of a party that timely re- *27 quested a jury trial. This Court’s rule that failure to furnish a jury bond timely waives a right to a jury trial is in no way inconsistent with the rule of La. C.C.P. art. 1733(C), which protects parties who rely on other parties’ timely motions for jury trial. AL had an opportunity to post the jury bond and failed to do so in accordance with the jury trial order. Furthermore, AL consented to the case management orders that provided for a bench trial, so it cannot contend that relied upon Republic’s request for a jury. Therefore, we do not find that the trial court erred in denying both of AL’s requests for a jury based upon the dismissal of Republic.
C & I and AL contend that they are entitled to a jury trial based upon AL’s correction of a “clerical error” in an unopposed motion for leave to file third amended and supplemental cross claim and third party demand to substitute C & I for “ABC Insurance Company.” The trial court granted AL’s motion on April 27, 2010. C & I then filed an answer and requested a jury trial on June 17, 2010. AL averred that it amended the cross-claim to name C & I when is discovered the proper name of the insurance company. During the hearing on C & I’s request for a Injury trial, the trial court opined that AL’s amended cross-claim was filed to circumvent the time limitations in La. C.C.P. art. 1733 because AL knew C & I was an insurer since at least 2006. The trial court stated that it granted AL’s motion for leave because it believed it to be a “housekeeping matter.” However, during the hearing, the trial court struck AL’s amended cross-claim from the record.
The trial court stated that it was striking the amended pleading because it believed the pleading was filed to circumvent the time limitations imposed by La. C.C.P. art. 1733. This reasoning follows the Louisiana Supreme Court’s holding in Barberito v. Green, 275 So.2d 407, 410 (La.1973), that a trial judge has discretion to refuse to allow the filing of amended pleadings that it finds are proffered for the purposes of circumventing the time limits. See also D’Angelo v. Prechter, 03-1713, pp. 12-13 (La.App. 4 Cir. 3/16/05), 899 So.2d 613, 620. Given the facts in the record regarding AL’s knowledge of C & I as an insurer and the trial court’s discretion regarding amended pleadings, which created the avenue for C & I to file a jury request, we do not find that the trial court abused its discretion by striking AL and C & I’s pleadings from the record, which therefore nullified C & I’s request for a jury trial.

Previous Analysis of the Requests for a Jury Trial

“[A]n appellate court ordinarily will not reconsider its own rulings of the law in the same case.” Bank One, Nat’l Ass’n v. Velten, 04-2001, p. 7 (La.App. 4 Cir. 8/17/05), 917 So.2d 454, 459. The law of the case “doctrine is a discretionary guide and is not applicable in cases of palpable error or where, if the law of the case were applied, manifest injustice would occur.” Sharkey v. Sterling Drug, Inc., 600 So.2d 701, 705 (La.App. 1st Cir.1992). Although the law of the case principle is generally reserved for issues from former and subsequent appeals, an |1sappellate court’s decisions on an application for supervisory review may also constitute a basis for the application of the doctrine. Brumfield v. Dyson, 418 So.2d 21, 23 (La.App. 1st Cir.1982). Law of the case will not be applied “when the underlying, operative facts upon which the court’s prior decision was based have changed.” Bank One, 04-2001, p. 7, 917 So.2d at 459.
In the case' sub judice, the trial court’s denial of AL’s first request for a jury trial and C & I’s request were reviewed by this Court via applications for supervisory review and both applications were denied. *28 There have been no changes in operative facts based upon which this Court’s decisions should change. Therefore, while we note that supervisory writs do not create jurisprudence, we find that the facts and circumstances of the record before us do not present a basis to differ from the previous procedural review conducted in the case sub judice.

DR. WILLIAM ZEGEL

Chartis, C & I, and ACE1 (collectively “Insurance Defendants”), as the insurers of GL and AL, assert that the trial court abused its discretion in admitting the testimony of Dr. William Zegel, the class representatives’ expert in chemical engineering, analyzing movement and chemicals though the environment, which included air dispersion modeling. The Insurance Defendants contend that Dr. Ze-gel’s testimony drastically changed from his testimony at the class certification hearing. The Insurance Defendants claim that Dr. Zegel “changed his opinion to shift causation away from the trucks, with whom the class settled prior to trial, and onto the remaining defendants, Ah’ Liq-uide and Global Lime.” The remainder of the Insurance Defendants’ arguments against Dr. Zegel’s testimony attacked his methodology and conclusions that differ from their own experts.
 “As to the issue of who should or should not be allowed to testify as an Inexpert, it is very well established in the case law that the trial court has discretion and will not be reversed on appeal absent clear error.” Tadlock v. Taylor, 02-0712, p. 3 (La.App. 4 Cir. 9/24/03), 857 So.2d 20, 25. “The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.” Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990). “The trial court’s decisions in applying the new reliability standards for expert testimony are also subject to reversal only for abuse of discretion or manifest error.” Tadlock, 02-0712, p. 4, 857 So.2d at 25. “[T]he Supreme Court replaced the ‘general acceptance’ standard of expert testimony with a standard that charges the trial court to act as ‘gatekeeper’ ensuring the relevance and reliability of scientific expert testimony.” Id., quoting Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). “The court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct.” Tadlock, 02-0712, p. 4, 857 So.2d at 26.
Dr. Zegel testified at length regarding his three-step methodology. First, Dr. Ze-gel determined the activity and the substance involved, carbide lime. Second, he calculated the carbide lime emissions rate into the air. Third, Dr. Zegel determined the dispersal rate of the carbide lime.
The change in Dr. Zegel’s opinion and calculations may be from information received since the class certification hearing. Dr. Zegel even admitted on cross-examination that the difference in his testimony was the result of a change in the information he possessed. As the trial court stated in its reasons for judgment, “the court believes that Zegel received significant updates of information between now and the class certification hearing.” The trial court further stated that “Zegel made lanfor an impressive witness, and the Court believes that when he received new information, regardless of whether it would make the model larger of smaller, he would simply plug the information in and ‘let the chips fall where they may.’ ” Dr. Zegel testified as to an example. Instead of simply taking the statement from the plaintiff class that the dump trucks did not *29 have tarps, Dr. Zegel discovered that the dump trucks did indeed have tarps to cover the loads of carbide lime. This information resulted in a decrease in the calculated carbide lime emissions rate.
Upon our review of the record, and given the vast discretion vested with the trial court regarding the admission of expert testimony, especially in a bench trial, we do not find that the trial court erred or abused its discretion in admitting the testimony of Dr. Zegel.

CAUSATION FOR MEDICAL DAMAGES

The Insurance Defendants allege that the trial court committed manifest error in determining that the class representatives established a causal connection between their alleged injuries and exposure to carbide lime, which is 90% calcium hydroxide. The Insurance Defendants contend that none of the class representatives testified that they sought medical attention for their alleged injuries[16] and that their alleged injuries could have been cause by seasonal allergies.
The class representatives aver that their testimony regarding their symptoms coupled with the experts’ testimony more than established a causal connection between their injuries and carbide lime exposure.
Miss Marshall[17] testified that she resided in the Reyne Apartment Complex |21in an apartment across from the AL site. She stated that she did not view any activity at the AL site until around December 2003. Eventually, she watched excavators digging and then dump trucks hauling away materials. Miss Marshall also stated that the dump trucks did not always use tarps to cover the material being hauled away. She further testified that dust would fly everywhere, which would clog the air conditioning units and get into the apartment through the kitchen window. Miss Marshall stated that the white dust would cover her car and everything outside of the apartment.
After the white dust began to collect, Miss Marshall noticed that her asthma worsened because she experienced more severe asthma attacks and used two rescue inhalers a month instead of one. Dr. Threasa C. Adderly, Miss Marshall’s primary care physician, allegedly prescribed Miss Marshall Advair at this time. Miss Marshall also described a burning sensation she experienced on her skin that increased when she perspired or was outside for an extended period of time. Miss Marshall testified that she went to see Dr. Adderly for the burning on her chest, for which Dr. Adderly prescribed triamcino-lone cream and Nizoral shampoo as a body wash for the irritation all over her body. She was also given eye drops for eye irritation. Further, Miss Marshall stated that she still has scarring on her chest and spots on her arms. Miss Marshall also testified that she had little pustule bumps all over her arms, back, and chest, and also suffered from nosebleeds. She believes that all of her problems were caused by the white dust. On cross-examination, Miss Marshall admitted that Dr. Adderly did not say that the white dust caused her medical issues. However, the record does not show that Miss Marshall and Dr. Ad-derly knew Miss Marshall was exposed to carbide lime dust.
Sylvia Marshall (“Ms. Marshall”), Miss Marshall’s mother, testified that she *30 l22lived with her daughter part-time while her husband was working on their house. When she took her grandchildren to school, she would have to wipe off the windshield because it was “covered with that white stuff.” Ms. Marshall stated that the car started peeling from the white dust. Ms. Marshall testified that the white dust came from the AL site across the street from her daughter’s apartment. She stated that some workers would drop some of the carbide lime on the ground and that it would fall off of the back of dump trucks and covered the grass, yard, and playground. Sometimes, the carbide lime would come off of the sides of the trucks like a liquid, but would blow around in the air like a powder. According to Ms. Marshall, this occurred with or without a tarp on the dump truck. Ms. Marshall also testified that her daughter suffered from itching, nosebleeds, and irritated eyes. Ms. Marshall remembered Dr. Ad-derly prescribing something for her daughter.
Mr. Adams, who worked for HANO as a maintenance manager at the Reyne Apartment Complex, testified that he viewed white dump trucks with a lot of white powder coming off of them. Mr. Adams did not remember if the dump trucks were covered with tarps because the white dust came off of the top of the dump truck and “rolled all over the place.” He also claimed that the white dust “came up” when the trucks began to come to the AL site. Mr. Adams stated that a white film covered the windshields of the vehicles. He further stated that he began to suffer from bad sinus problems for four to six weeks and had a water-bump like rash on his hands. Mr. Adams testified that the doctor instructed him to take Claritin. In addition, Mr. Adams felt a “little burn; little itch” for four to five months. Mr. Adams did not suffer from these problems before the dump trucks and his symptoms ceased in 2005.
| ^Brenda Lewis, Mr. Adams’ wife, testified that she took Mr. Adams to the doctor twice for sinus problems because Mr. Adams had “white, cloggy stuff coming out heavy.” Ms. Lewis stated that Mr. Adams had something like water bumps on his hands and that his sinus issues lasted about a year. Ms. Lewis noticed that Mr. Adams’ clothes contained white dust while doing laundry.
Ms. Andrews, another resident of the Reyne Apartment Complex and Miss Marshall’s neighbor, testified that she viewed three or four dump trucks across the street, which contained a white substance. She stated that white powder was “falling form the back of the tailgate and from off the top of the trucks.” Ms. Andrews testified that the white dust was dispersed onto cars, houses, the grass, the playground, porch railings, and the window air conditioning units. She also stated that the white dust “ate” the color off of the top of the car. After getting inside her apartment through the front door, an open window in the kitchen, on clothes, and shoes, the white dust covered her end tables. Ms. Andrews did not remember seeing white dust to that degree before the dump trucks. Because of the dust, Ms. Andrews had to change her daily routine and kept her children inside more often.
The white dust caused Ms. Andrews’ skin to burn; eyes to burn, turn red, become very itchy, and irritated; and a little rash on the inner part of her arm. Ms. Andrews testified that she could not afford to go to the doctor, so she used over-the-counter eye drops for her eyes. Her symptoms lasted from two to three months and cleared up after evacuating for Hurricane Katrina.
Ms. Jones, another resident of the Reyne Apartment Complex, testified that *31 in the beginning of the removal project, gas tanker type trucks were working at the AL site, but that by the end of 2003, she just witnessed dump trucks. She stated that she viewed two or three dump trucks on a daily basis. Ms. Jones testified that ^if the material was wet, then “white stuff’ would drain onto the streets and if it was dry, the white dust would enter the air. The white dust came through her window air conditioning units, so she decided to stop using the units. She stated that she had to purchase fans instead. Further, Ms. Jones testified that she could not sit outside anymore, which aggravated and depressed her, and that she had to cease hanging clothes on the line to dry.
Ms. Jones suffered from eye irritation and went to a doctor for treatment. She stated that the doctor pulled white, chalky “stuff’ out of the bottom of her eye and gave her eye drops. Ms. Jones’ mouth was sore and her hands, legs, face, chest, hair, and scalp itched.
Dr. Vince Wilson, the class representatives’ expert in toxicology, environmental toxicology, and pharmacology,[18] testified that the AL site contained a 1.5 acre containment pond of carbide lime, which is mostly calcium hydroxide. Dr. Wilson stated that carbide lime has toxic impacts on skin, eyes, nasopharyngeal systems, the bronchus, and pulmonary system. In regards to hazards, Dr. Wilson stated that carbide lime has a health rating of three on the Material Safety Data Sheet (“MSDS”).[19] The MSDS indicated that a “[o]ne time over-exposure” could “result in permanent injury and may be fatal.” Further, Dr. Wilson considered calcium hydroxide a hazardous chemical even though it is not labeled as such and he stated that the pH of carbide lime runs between 12.4 and 12.5. Dr. Wilson testified that carbide lime could cause skin irritation, itching, rashes, burning, tearing of the eyes, conjunctivitis, edema, runny nose, sinus problems, and asthma like problems. He also stated that carbide lime exposure could affect the mucous 12r,membranes, eyes, mouth, and nasal cavities.
When the carbide lime dries out, it would become airborne. He also testified that carbide lime would easily “fluff’ into the air. Dr. Wilson further opined that the carbide lime was dispersed from the dump trucks, spillage, dust off of the trucks, mixing it with the material on existing roads and the public road outside of the AL site. Dr. Wilson testified that the LDEQ received complaints about the AL site in August 2004. After reviewing all of the evidence, Dr. Wilson stated that “from all the material that I could go through and the fact that they — you can see this dust on cars, on railing on places, it made perfect sense to me that the amount of material in that air. Is that close to us. Those individuals are definitely going to be exposed.”
After conducting his research and reviewing evidence, Dr. Wilson concluded that it was “more likely than not, that they [class representatives] were exposed to calcium hydroxide to produce this impact.” He opined that this type of exposure to carbide lime could cause the complaints like those of the class representatives. He specifically noted that the carbide lime dust could have caused Miss Marshall’s extra asthma attacks. On cross-examina *32 tion, Dr. Wilson testified that not everyone would react the same way to the same exposure to carbide lime. Finally, Dr. Wilson reiterated his conclusion that carbide lime is toxic and hazardous.
Dr. Zegel, the class representatives’ expert in chemical engineering and analyzing movement and chemicals in the environment, which included air dispersion modeling, testified that the carbide lime was over ninety percent carbide calcium hydroxide. Dr. Zegel stated that “fugitive” carbide lime dust could be dispersed from the material being transferred into the dump trucks, from the trucks moving, by the wind when the material was being carried out, and from being | ¾-,placed on the paved and unpaved roads. After utilizing his three-step methodology as previously discussed, the digging and dumping of the carbide lime would create a 1.7 gram of PM-10 [20] per hour emission rate. The emission rate for unpaved roads was 2570 grams of PM-10 per vehicle for every kilometer travelled. As for paved roads, the emission would have been 1,031 grams of PM-10 per hour. Dr. Zegel calculated that five dump truckloads of carbide lime could leave the AL site per hour.
Dr. Zegel testified that he was prudent with his numbers and calculations, but calculated that it was more likely than not that exposure exceeded 150 micrograms per cubic meter per part PM-10[21] about a mile out. In fact, he calculated that the concentration would have been about 188 micrograms per cubic meter at 2,000 meters. Dr. Zegel decreased his calculations when he learned that the dump trucks utilized tarps.
On cross-examination, Dr. Zegel stated that he did not incorporate specific meteorological conditions data from the time period because it was unnecessary for his calculations. When confronted with the fact that the carbide lime would still contain water when transported in the dump trucks, Dr. Zegel stated that the carbide lime would dry from the top down and that the top one or two millimeters would dry out as the trucks travelled.
Dr. Judd Shellito, the class representatives’ medical expert in internal and pulmonary medicine with an expertise in environmental and occupational exposures, testified that calcium hydroxide is a highly caustic hazardous chemical with the potential to cause tissue injury, burns, and inflammation. Dr. Shellito ^espoused that people with pre-existing conditions would experience problems at a lower exposure or dose of carbide lime dust than others. Dr. Shellito stated that people living next to the AL site “were in a position to be exposed to that material if it became airborne; that the material was excavated or removed in a manner that created a great deal of dust and that dust could have reached the neighborhood residents.” Further, he stated that “[t]he residents experienced symptoms that were temporarily related to the excavation of the material in the ponds and these symptoms included chest pain, burning eyes, nosebleeds, irritated sinuses, shortness of breath, nausea, vomiting, skin rash, and cough.” These symptoms, Dr. Shellito concluded, “were medically consistent with exposure to calcium hydroxide.” After finding no other cause for the symptoms, Dr. Shellito concluded “that it was more likely than not that exposure to calcium hydroxide in the lime ponds caused the symptoms in the neighborhood residents.” Dr. Shellito testified that he believed there *33 “was a sufficient dose for these individuals to result in the symptoms that did occur.”
Whitney Morgan, GL’s expert in the field of transportation safety, Federal Carriers Safety regulations, and the Federal Hazardous materials regulations, testified that carbide lime is not listed as a hazardous material. Therefore, there was no requirement that any of the trucks transporting carbide lime had to display a placard. Lastly, Mr. Morgan stated that triaxle dump trucks were approved by the Federal Motor Carriers Safety regulations to carry carbide lime.
Tom Dydek, GL and AL’s expert in toxicology, testified that there was “no reliable evidence that there was enough of an exposure for the plaintiffs to carbide lime to have caused the symptoms and medical problems that they” alleged. Mr. Dydek alleged that the drying of the top layer of carbide lime would not occur |2Rquickly and that the top layer would form a crust. He stated that carbide lime could be a contact hazard and corrosive to the body at a high enough dose. Additionally, Mr. Dydek testified that the symptoms complained of would be consistent with a high enough exposure to carbide lime. However, Mr. Dydek stated that he did not “believe that the dose would have been high enough to cause what could happen at a very high level” and that there was no evidence that the dust contained carbide lime.
Dr. Douglas Swift, a defense expert in the field of occupational and environmental medicine, testified that carbide lime was a potential cause of irritation to the eyes, nasal passages, throat, and bronchi with no latency period. Dr. Swift “saw no evidence or any documentation of any harm or long-lasting illnesses in the records” he reviewed. Although he stated that upper respiratory and skin rash issues might have been possible, he found no records as documentation. After reviewing the files of the class representatives, Dr. Swift stated that he found no documentary evidence referencing an exposure. However, the symptoms complained of were consistent with a sufficient exposure to carbide lime dust and the irritant symptoms associated therewith.
Gale Hoffnagle, a defense expert in the field of air emissions, dispersion modeling, and meteorology, stated that his opinion was “that the plaintiffs were not exposed to a concentration greater than the National Ambient Air Quality Standards” and that Dr. Zegel’s methodology was invalid. Further, he believed that “concentrations above the National Ambient Air Quality Standards” did “not go out of the plant site.”
As opposed to Dr. Zegel’s calculated 1.68 trucks per hour, Mr. Hoffnagle calculated 1.09 trucks per hour. Mr. Hoffnagle also opined that the rain during the 12!lclass period would have made it more difficult for the carbide lime to become airborne and that positive control measures were taken by spraying the roads with water. According to Mr. Hoffnagle’s calculations, which included weather data, the plaintiffs could have been exposed to carbide lime dust for only twenty-five hours “out of the 215 hours when trucks were present at the site.” For paved roads, Mr. Hoffnagle calculated an emissions rate of .028 grams per second of PM-10 and .004 grams per second for PM-2.5. The emissions rate for unpaved roads was .431 grams per second for PM-10 and .043 grams per second for PM-2.5. These emission rate calculations were five times lower than those of Dr. Zegel. Mr. Hoffnagle contended that Dr. Zegel doubled the amount of unpaved road.
“Causation is the first element of proof of a negligence claim.” Watters v. Dep’t of Soc. Sers., 08-0977, p. 16 (La.App. *34 4 Cir. 6/17/09), 15 So.3d 1128, 1142. “Causation is a factual finding that should not be disturbed unless the record does not furnish a basis for that finding, and it is clearly wrong or manifestly erroneous.” Thomas v. A.P. Green Indus., Inc., 05-1064, p. 23 (La.App. 4 Cir. 5/31/06), 933 So.2d 843, 860. “When causation and credibility are major issues, a factfinder’s findings are entitled to ‘great deference,’ and may not be overturned unless they are manifestly erroneous.” Richardson v. Am. Cyanamid Co., 99-675-99-682, p. 18 (La.App. 5 Cir. 2/29/00), 757 So.2d 135, 144; quoting Guillory v. Ins. Co. of N. Am., 96-1084, p. 5 (La.4/8/97), 692 So.2d 1029, 1032. “The issue of causation is a fact specific inquiry and we are called to decide whether the factfinder’s conclusion is reasonable.” Richardson, 99-675-99-682, p. 18, 757 So.2d at 144. “It is clear that Louisiana law does not require medical expert examination of each class member’s symptoms before the court can find that specific causation has been met.” Watters v. Dep’t of Soc. Servs., 11-1174, p. 8 (La.App. 4 Cir. 3/14/12), 102 So.3d 118, 124. “The test for determining the causal relationship between the tortious conduct and subsequent injuries is whether the plaintiff proved through medical testimony that it was more probable than not that subsequent injuries were caused by the accident.” Watters, 08-0977, p. 31, 15 So.3d at 1152.
Testimony was presented that exposure carbide lime has no latency period, which corresponds to the class representatives’ testimony that their medical issues began when the white dust appeared after the removal project switched to dump trucks at the AL site. General causation, that exposure to carbide lime dust could cause the class representatives’ symptoms, was established through the testimony of Dr. Wilson; Dr. Shellito; Mr. Dydek, although he stated that symptoms would only occur with a high enough dose; and Dr. Swift, who stated that although he found no evidence that the class representatives were exposed to carbide lime, their symptoms were consistent with exposure. The testimony of the class representatives regarding the short-term adverse health effects they experienced while the white dust was present coupled with the testimony of Dr. Wilson, Dr. Zegel, and Dr. Shellito linking those health effects to their exposure to carbide lime supports the trial court’s finding of specific causation. Additionally, the juxtaposed testimony of the experts regarding exposure and the alleged correlation to the class representatives’ alleged symptoms tasked the trial court with credibility determinations as well as factual findings. Therefore, we do not find that the trial court’s findings regarding causation were manifestly erroneous or clearly wrong.

MICHELLE MARSHALL

The Insurance Defendants assert that the trial court abused its discretion in awarding Miss Marshall $23,000 for general damages. They contend that the trial __[2jCourt “grossly over-valued Michelle Marshall’s scarring injuries, which resulted in a massively inflated award.” Additionally, the Insurance Defendants aver that Miss Marshall’s award was excessive because of her pre-existing skin conditions and stated that she was “rewarded for not seeking medical treatment.”
Miss Marshall contends that the trial court is vested with vast discretion in determining general damage awards and that the award was based on the trial court’s evaluation of the evidence adduced during the trial.
Miss Marshall testified that her skin was irritated and burning, which lead to open spots on her chest, back and arms; that *35 she had white bumps on her arms, back and chest; and that she developed scarring on her chest and arms due to scratching. Miss Marshall stated that she did not have open scarring prior to the white dust. She also testified as to the medical treatment she sought from Dr. Adderly for herself and her children.
The factfinder is vested with much discretion when assessing quantum for a plaintiffs injuries. Reck v. Stevens, 373 So.2d 498, 500 (La.1979), quoting Gaspard v. LeMaire, 245 La. 239, 265, 158 So.2d 149, 158 (1963) (on rehearing). The Louisiana Supreme Court stated that:
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive.
Reck, 373 So.2d at 501. Furthermore, the Louisiana Supreme Court opined that:
we believe that, heretofore, courts of appeal have placed too much emphasis on their review of other reported decisions. Certainly no two cases are ever fully alike. And whether two eases are so similar as to produce like quantum judgments is hardly discernible by gleaning the | S2facts of the comparable decision from simply a written opinion of an appellate tribunal. Of course, another factor bearing on this matter is that significant change has been, and is taking place in our society not the least of which are changes in economic conditions (particularly rampant inflation), fluctuating job categories, employment opportunities, and even lifestyles. Furthermore, it is impossible for an appellate court to judge what evidence in a particular case was given special weight by the finder of fact.
Coco v. Winston Indus., Inc., 341 So.2d 332, 335-36 (La.1976). In the 1980’s, the Third Circuit upheld an award of $20,000 for a plaintiff who suffered from burns and scarring. Jowers v. Commercial Union Ins. Co., 435 So.2d 575, 580 (La.App. 3rd Cir.1983).
The trial court evaluated Miss Marshall’s credibility and was in the position to view her alleged scarring from the carbide lime. In regards to Miss Marshall’s alleged lack of medical treatment for carbide lime exposure, the trial court stated in its reasons for judgment that this was “due to her lack of knowledge that she was exposed.” Following her exposure, Miss Marshall’s symptoms “returned to preex-posure level, leaving only the scarring and her normal skin problems.” The trial court found Miss Marshall to be a credible witness who suffered more extensively than that of the other class representatives. Therefore, we do not find that the trial court abused its discretion is awarding Miss Marshall $23,000 for the scars she received as a result of exposure to carbide lime.

CLASS DECERTIFICATION

The Insurance Defendants contend that the trial court should have decer-tified the entire class. They contend that the class representatives lacked evidence demonstrating that material from the AL site caused damages and that the potential class members are not ascertainable.
IsiiThis Court already addressed the certification of the class in Marshall ex rel. minor children v. Air Liquide-Big Three, Inc., 08-0668 (La.App. 4 Cir. 12/17/08), 2 So.3d 541, wherein we thoroughly examined the original certification of the plaintiff class. This Court and the Louisiana Supreme Court affirmed the trial court’s *36 class certification. Id., writ denied sub nom., Marshall v. Air Liquide-Big Three Inc., 09-0105 (La.3/13/09), 5 So.3d 125, and writ denied sub nom., Marshall v. Air Liquide-Big Three Inc., 09-0111 (La.3/13/09), 5 So.3d 125.
“The jurisprudence indicates that a trial court’s ruling concerning a motion to decertify a class is reviewed under an abuse of discretion standard.” Billieson v. City of New Orleans, 09-0410, p. 9 (La.App. 4 Cir. 11/12/09), 26 So.3d 796, 802. “Any error to be made in deciding class action issues should be in favor of’ maintaining the class action. Oliver v. Orleans Parish Sch. Bd., 09-0489, p. 9 (La.App. 4 Cir. 11/12/09), 25 So.3d 189, 198. If there has been no “material change in the facts, law or circumstances since the initial class ruling that would warrant class de-certification,” then the trial court did not abuse its discretion. Billieson, 09-0410, p. 9, 26 So.3d at 802. Upon our review of the record, we do not find that any material changes have occurred, which would warrant decertifying the class.
As examined above, we agree that the class representative presented evidence of causation, i.e., that material from the AL site caused damages. Additionally, the plaintiff class is ascertainable because several experts testified that the area surrounding the AL site was an industrial corridor. Therefore, the employees of the surrounding businesses and few residents within a mile of the AL site are discoverable. The plaintiff class also remains the same, except for the shortened time period of exposure, with common issues of law and fact ^predominating over individual issues of law and fact. Procedurally, the case sub judice remains the same. Accordingly, we do not find that the trial court abused its discretion in denying the motion to decertify the class.

CLASS REDEFINITION

Chartis and C & I, as the insurers of GL and AL, as well as ACE1, as the insurer of AL (collectively the “Insurance Defendants”) also assert that the trial court erred by not redefining the class to exclude workers around the AL site or decreasing the exposure area from one mile to one-quarter mile.
The trial court, in the unsigned reasons for judgment contained in record, redefined the class after trial as follows:
Any person, including named plaintiffs and their minor children, who resided or regularly worked within a one-mile radius of the Air Liquide America Facility located at 6600 Old Gentilly Road, New Orleans, Louisiana between July 2004 to the end of 2004, and who may have been exposed to calcium hydroxide coming form the Air Liquide facility.
The redefinition reduced the exposure period for the plaintiff class. The Insurance Defendants contend that workers within the one-mile radius should have been excluded from the class because neither AL nor GL received workers compensation claims regarding the carbide lime and because other workers at the AL site testified that they did not experience any adverse reactions from exposure to carbide lime.
The class representatives noted that the Insurance Defendants failed to address why the geographic size of the class should be reduced to one-quarter mile. We agree. The brief of the Insurance Defendants fails to include any reasoning to support their contention. Dr. Zegel testified that his conclusions demonstrated that carbide lime exposure was likely about a mile “out” from the AL site. 1 ^Additionally, Mr. Adams, a class representative, was a HANO worker at the Reyne Apartment Complex who was ex *37 posed to carbide lime and suffered an adverse reaction.
Therefore, given the lack of evidence as to why the geographic size of the class should be reduced, Dr. Zegel’s testimony that the geographic zone should be a one-mile radius, the fact that Mr. Adams fits into the category of workers possibly exposed in the class definition, and that we found that no material changes occurred warranting decertification, we do not find that the trial court erred in its redefinition of the class.

OPERATIONAL CONTROL

AL, Chartis, C & I, and ACE1 contend that the trial court committed manifest error when “it held Air Liquide liable for Global Lime’s wrongful conduct pursuant to the ‘operational control’ exception to the independent contractor doctrine” resulting in twenty-five percent liability under La. C.C. art. 2815 and 2316.
“As a general rule, property owners are not liable for the negligence of an independent contractor.” Davenport v. Amax Nickel, Inc., 569 So.2d 23, 27 (La.App. 4th Cir.1990). The property owner may be held liable for the actions of the independent contractor if “the contractor is performing ultra-hazardous work” or if the property owner “exercises control over the contractor’s methods of operation or gives express or implied authorization to an unsafe practice.” Morales v. Davis Bros. Const. Co., Inc., 94-0902, p. 3 (La.App. 4 Cir. 12/15/94), 647 So.2d 1302, 1305. “The fact that the owner periodically inspects the job site to be sure that work is being performed in accordance with the specifications does not constitute the exercise of operational control.” Id. “The crucial question centers on the |Sfiemployer’s right to exercise control.” Morales, 94-0902, p. 4, 647 So.2d at 1306. However, “[a] principal is entitled to maintain supervisory control over a project done by an independent contractor in order to insure compliance with the contract terms.” Nippa v. Chevron, USA, 99-2953, p. 6 (La.App. 4 Cir. 11/15/00), 774 So.2d 310, 314.
Kelly Davidson, a former environmental specialist for AL, testified that when AL received notice from the LDEQ of the complaint regarding water run-off containing carbide lime due to a problem with the berm on the AL site, she notified Mr. Baggett to remedy the situation. Ms. Davidson also stated that AL stopped all work at the AL site until GL corrected the berm issue. Ms. Davidson testified that AL was responsible for “administratively managing Roy and the contractors to make sure they did everything.” However, Ms. Davidson then stated that AL was not obligated to do anything under the contract between AL and GL.
In regards to the dump trucks, Ms. Davidson testified that when she learned of their usage, she wrote a letter and told GL to follow to reclamation plan and that if GL did not, then the LDEQ would have to approve any changes. She then told Mark White, the chief operating officer of GL, to switch back to the tanker trucks used for hydromining or amend the reclamation plan. Most notably, Ms. Davidson stated that AL “could have stopped this project at any time, sure. It was AL’s plant, property, and lime.”
Mr. White testified that using the tanker trucks for hydromining the carbide lime was too slow and not productive. The removal process was more efficient with excavators and dump trucks. However, Mr. White stated that Ms. Davidson visited the AL site because she was very concerned about the usage of dump trucks in contravention with the reclamation plan. He further testified that Ms. Davidson *38 | S7“raised hell” during the run-off issue and that she gave specific instructions to comply with the agreement. He stated that the complaint regarding the run-off from the berm was from the “housing complex” and he remembered the letter from AL that ordered GL to stop work. Mr. White testified that the complaints about the AL site were continuous and that “you could not satisfy those people.”[22]
Mr. Baggett testified that he believed the responsibility of the site belonged to AL. He recounted a letter from AL regarding water flowing over the berm. The letter instructed GL to repair the berm in order to stop the water run-off into the ditch, which caused a complaint to the LDEQ, and that GL had to stop all work at AL’s site until all necessary LDEQ permits and approvals were granted.
Susan Cathey, AL’s corporate representative, testified that GL was AL’s independent contractor. Although the reclamation plan stated it was on behalf of AL, the plan was for GL. Ms. Cathey stated that AL knew that the usage of dump trucks to remove the carbide lime was in contravention to the reclamation plan, but AL did not inform the LDEQ of the change.
The contract between AL and GL contained the following provision:
Global shall at all times enforce strict discipline and good order among its employees and subcontractors while at the Plant. Global shall instruct said persons to conduct their duties in such a manner and at such times so as to not unreasonably interfere with or interrupt Air Liq-uide operations ... Failure to fulfill these obligations may be immediately remedied by Air Liquide, at Air Liq-uide’s discretion, up to and including employee expulsion from the site, subcontractor expulsion from the site, and/or contract termination.
Clearly, this provision demonstrates AL’s reservation of the right to exercise control over GL employees. The trial court agreed. Further, Ms. Davidson ] 38testified that AL stopped all work at the AL site after the complaint regarding tainted water run-off. She stated that she told Mr. White to return to the usage of tanker trucks for hydromining. Lastly, Ms. Davidson testified that AL could have shut down the AL site at any time. Ms. Davidson’s testimony is corroborated by that of Mr. White and Mr. Baggett. Therefore, given our review of the record, we do not find that the trial court committed manifest error in finding AL retained operational control over the GL’s work at the AL site and assessing AL twenty-five percent liability.

GARDE LIABILITY

AL and the Insurance Defendants assert that the trial court committed manifest error in imposing twenty-five percent garde liability, pursuant to La. C.C. art. 2317 and 2317.1, on AL because it “did not have care, custody, or control of the carbide lime once Global Lime removed it from the impoundment.”
La. C.C. art. 2317 provides that “[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody.” Furthermore,
[ t]he owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the *39 damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.
La. C.C. art. 2817.1. “Thus, the plaintiff must prove three elements: 1) the defendant either owned or had care, custody, or control of the thing in question; 2) the thing was a cause-in-fact of the plaintiffs injuries; and 3) the thing presented an unreasonable risk of harm.” Graubarth v. French Mkt. Corp., 07-0416, p. 4 (La.App. 4 Cir. 10/24/07), 970 So.2d 660, 664. Garde “is largely a question of fact.” Leaman v. Cont’l Cas. Co., 00-0292, p. 4 (La.App. 4 Cir. 9/26/01), 798 So.2d 285, 289.
“[T]he courts have recognized the reality that custody or garde is a broader concept than ownership and custody or garde may be shared by multiple parties.” Id. To determine if garde is shared, the factfinder looks “to the parties’ actions and relationships to the thing causing injury.” Id. “The test for determining custody or garde is two-fold: 1) whether the person bears such a relationship as to have the right of direction or control over the thing, and 2) what, if any, kind of benefit the person derives from the thing.” Graubarth, 07-0416, pp. 4-5, 970 So.2d at 664.
“[T]he person who has the garde of a thing shall be strictly liable for damage caused another by the vice or defect of the thing, his legal responsibility being based on the breach of his legal obligation to keep his thing in such condition that it does no damage to others.” King v. Louviere, 543 So.2d 1327, 1328 (La.1989). “The things in one’s care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them.” King, 543 So.2d at 1329. “[T]his Court determined that custody or garde will not be shared or transferred when there is a limited ability to inspect the premises, limited access to enter the premises, and an inability to alter the premises.” Graubarth, 07-0416, p. 6, 970 So.2d at 664-65.
The trial court found that pursuant to La. C.C. art. 2315 and La. C.C. art. 2315.1 that “the shoring of the road with Carbide lime coupled with the transportation of Carbide lime was the cause-in-fact of the plaintiffs’ injury and | ^constituted an unreasonable risk of harm.”[23] The trial court further found that garde was shared between AL, GL, and the trucking companies.
AL contends that the carbide lime was similar to sand removed from its original location wherein the Fifth Circuit stated that “[o]nce the sand is severed from its natural position, it logically follows, and we hold, that it then becomes a corporeal movable or tangible personal property of the one who severs it.” Sales Tax Collector, St. Charles Parish v. Westside Sand Co., Inc., 534 So.2d 454, 457 (La.App. 5th Cir.1988).
Although the contract between GL and AL stated that GL became the owner of the carbide lime when it took possession of it, we disagree with AL’s assertion based on our utilization and analyzation of the *40 Graubarth factors as enumerated by this Court. As it pertains to the Graubarth factor regarding obtaining a benefit, AL derived a benefit by having the carbide lime removed from its property in an effort to make the property marketable in the future. AL also benefitted from carbide lime being added to the internal roadways, as reflected by testimony in the record. The other Graubarth factor, whether AL had a right of direction or control of the carbide lime, supports the trial court’s judgment. We previously noted that AL retained operational control over GL at the AL site. AL, through Ms. Davidson, instructed GL on how to haul the carbide lime when GL performed in contravention of the reclamation plan and even shut down the entire AL site until a water run-off problem was corrected. Ms. Davidson could visit the AL site and testified that AL “could have stopped this project at any time, sure. It was AL’s Implant, property, and lime.” Accordingly, having met both of these requirements, we do not find that the trial court committed manifest error by finding that AL shared garde with GL and the trucking companies.

LA. C.C. ART. 667 LIABILITY

AL and the Insurance Defendants aver that the trial court committed manifest error in finding AL 100% liable pursuant to La. C.C. art. 667. They contend that the record lacks evidence demonstrating that AL failed to exercise reasonable care, that AL did not cause the alleged carbide lime dust dispersal, and that the trial court’s judgment was based on “a worst-case scenario” rather than record evidence. Alternatively, they assert that the trial court's award of damages pursuant to La. C.C. art. 667 resulted in duplica-tive damage awards.
La. C.C. art. 667 provides that:
Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. (Emphasis added).
“It is a ‘general principle of law, that owners may use their property as they please, with the exception that they do no injury to others,’ under the theory of ‘sic tuum utere ut alium non laedas.’ ” Yokum v. 615 Bourbon St., L.L.C., 07-1785, p. 17 (La.2/26/08), 977 So.2d 859, 872, quoting Boatner v. Henderson & Al., 5 Mart, (n.s.) 186 (La.1826). The Louisiana Supreme Court stated that to hold a landowner responsible “for. damages allegedly caused by works or actions on his property, it 142must be shown that the proprietor/landowner knew or should have known that the “works” ... would cause damage, and that the damage could have been prevented by the exercise of reasonable care.” Yokum, 07-1785, pp. 21-22, 977 So.2d at 874. “There is recovery despite reasonableness and prudence if the work causes damage.” Butler, 529 So.2d at 379. The property owner is also responsible for the actions of “the agent or contractor, who, as in this case, becomes solidarity liable with the proprietor if his activity causes damage to a neighbor.” Chaney v. Travelers Ins. Co., 259 La. 1, 16-17, 249 So.2d 181, 186 (La.1971).
*41 The trial court iterated that AL’s “conduct caused the dust dispersal onto plaintiffs’ property and that such conduct caused the plaintiffs [sic] injury — particularly the internal roadway that was on the Air Liquide site.” Further, the trial court stated that “[t]he degree of the intrusion was over several months where dust was both outside and came into plaintiffs’ homes. Furthermore, the effect of the activity caused great harm to the community based upon the evidence.”
While we might have reached a different or similar conclusion based on different factual findings than the trial court, we cannot substitute our judgment of the facts when the standard of review is one of manifest error.
As the owner of the carbide lime removal site, AL was the only party that could be found liable pursuant to La. C.C. art. 667. Causation is the first component to prove La. C.C. art. 667 liability. Butler v. Baber, 529 So.2d 374, 378 (La.1988). We examined and upheld the trial court’s findings of causation as stated above. Ms. Davidson testified as to the letters the LDEQ sent to AL regarding the complaints about activity at the AL site. Ms. Davidson’s testimony also revealed that AL was aware that GL deviated from the reclamation plan by excavating the carbide lime, allowing it to dry out, and then haul it away in tri-axle |4Sdump trucks. Also, being the property owner, AL was aware of the possible dangers carbide lime posed because of the information contained in the MSDS sheet. AL failed to exercise reasonable care when it failed to prevent GL from continuing to use tri-axle dump trucks to haul the carbide lime in known contravention of the reclamation plan GL was hired to execute. Ms. Davidson’s testimony supports AL’s ability to close the AL site because she stated that AL “could have stopped this project at any time, sure. It was AL’s plant, property, and lime.” The class representatives testified that the white dust did not appear until they noticed the dump trucks. Therefore, after our thorough and extensive review of the record before us, we find enough evidence to impose La. C.C. art. 667 liability upon AL and do not find that the trial court committed manifest error.

Duplicative Damages

We find no merit to the assertion that the trial court erred in awarding damages pursuant to La. C.C. art. 667 because the damages were allegedly duplicative to those already awarded. The cases relied upon by AL and the Insurance Defendants do not specifically stand for that premise. Liability pursuant to La. C.C. art. 667 does not require negligence. Inabnet v. Exxon Corp., 93-0681, p. 11 (La.9/6/94), 642 So.2d 1243, 1251. The obligation imposed by La. C.C. art. 667 is legal in nature and not delictual. Dean v. Hercules, Inc., 328 So.2d 69, 72 (La.1976). Therefore, we do not find that the trial court committed manifest error.

CLAIMS OF EACH CLASS MEMBER

Chartis and C & I argue that the claims of each individual class member do not constitute a separate accident or occurrence per policy period. We disagree, and considering the evidence, we find no manifest error.
It is undisputed that the “exposure theory” applies to this case. In Cole v. Celotex Corp., 599 So.2d 1058 (La.1992), the Supreme Court adopted the “exposure theory” under which “coverage is triggered by the exposure to the harmful conditions during the policy period.” Cole, 599 So.2d at 1076. In Cole, it was determined that nine corporate executive officers were negligent in failing to provide plaintiffs, who had contracted an asbestos-related occupational disease, with a safe *42 place to work from 1945 through 1976. Cole, 599 So.2d at 1061-62. The Court noted that if coverage during the exposure period were provided by multiple insurers, it would be necessary to rule that an insured may recover under all available coverages up to the limits of each policy. Cole, 599 So.2d at 1079. The Supreme Court considered and rejected the “manifestation theory” under which coverage is triggered only under the policy in effect when the injury becomes manifest because the supreme court concluded that the key relevant events giving rise to a claim in a long-latency occupational disease cases are the repeated tortious exposures resulting in continuous, on-going damages, although the disease may not be considered contracted or manifested until later. Cole, 599 So.2d at 1066.
Notwithstanding their agreement to apply the “exposure theory” in this case, Chartis and C & I contend the collective claims of each individual member of the class should be considered as a separate accident for each policy period and that the collective claims of a certified class constitute one occurrence under the plain meaning of occurrence contained in the Chartis policies.
This Court, along with the Louisiana Supreme Court and the Fifth Circuit of the United States, opined that “per occurrence” in the limitation of liability clause of a liability policy refers to the effect, not the cause, of the occurrence, thus making full policy limits available to each damaged party. See Tesvich v. 3-A’s Towing Co., 547 So.2d 1106 (La.App. 4th Cir.1989), writs denied, 552 So.2d 383 (La.1989), 552 So.2d 384 (La.1989)[24]; Lombard v. Sewerage and Water Bd. of New Orleans, 284 So.2d 905 (La.1973); Soc’y of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co., 26 F.3d 1359 (5th Cir.1994)[25]; and Exxon Corp. v. St. Paul Fire and Marine Ins. Co., 129 F.3d 781 (5th Cir.1997)[26].
Chartis and C & I do not dispute the trial court’s finding that the applicable exposure period is July 2004 through December 2004, and therefore, the only policies at issue are the two Chartis Commercial General Liability and Pollution Legal policies (EG 377-9992 and EG 150-6777) and *43 the C & I Business Auto policies (CA 505-37-53 for yearly periods of coverage). However, they argue that there is no individual plaintiff’s injury that is causally attributable to an identifiable or specific release or discharge of carbide lime dust. Nevertheless, they acknowledge that the injuries of the plaintiffs “were attributable to a lengthy course of non-specified releases or discharges of dust over a period of time.” We agree, and find that the limitation of liability clause at issue refers to the effect, not 146the cause, of the occurrence, thus making full policy limits available to each damaged plaintiff.
In this case, the trial court adjudged, in part, that:
Under AISLIC[27] policies, each of the plaintiffs’ representatives’ claims are considered an “occurrence.” As such, plaintiffs are permitted for future class action litigation to claim up to $4 million (the aggregate limits) from the two applicable AISLIC policies falling within the amended class definition period. The trial court additionally stated that the plaintiffs are permitted future class action litigation to claim up to $2 million (the aggregate limits) from the two applicable C & I policies.[28]
“Occurrence” is defined in the Chartis policies as follows:
20. Occurrence means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.[29]
“Accident” is defined in the C & I policies as follows:
A. “Accident” includes continuous or repeated exposure to the same conditions resulting in “bodily injury” or “property damage”.[30] .
The C & I policies provide a limit of insurance as follows:
All “bodily injury”, “property damage” and “covered pollution cost of expense” resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one “accident”.
The facts of this case are similar to those of Lombard. In Lombard, numerous plaintiffs sought to recover for damages caused by a canal construction project. The project lasted for more than one year. The plaintiffs claimed various 147forms of property damage to their houses caused by excavation, pile driving, and other activities carried on during the course of the construction project. The insurance policy for the City of New Orleans substituted the term “occurrence” for “accident.” An “occurrence” was defined as an accident or a continuous or repeated exposure to conditions which resulted during the policy period in injury to person or real or tangible property which is accidentally caused. All damages arising out of such exposure to substantially the same general conditions were to be considered as arising out of one occurrence and one policy limit would be applicable.
The Supreme Court in Lombard found that the construction project, which lasted for more than one year, was not a single *44 “occurrence” within the contemplation of the insurance policy, but was a series of “occurrences” resulting in damages during the course of the prolonged undertaking. The Court stated that the word “occurrence” as used in the policy must be construed from the point of view of the many persons whose property was damaged. The Court found that when the separate property of each plaintiff was damaged by a series of events, one occurrence was involved insofar as each property owner was concerned. Although the same causes may have operated on several properties at the same time, resulting in varying degrees of damage, the Court found that it could not be regarded as one occurrence, but the damage to each plaintiff was a separate occurrence.
In other words, the Lombard court held that the word “occurrence” should be construed from the point of view of each person whose property was damaged. Even though the same event caused damage to more than one property owner, it was to be regarded as a separate occurrence as to each property owner. Therefore, |4Seach property owner was entitled to recover up to the limits of liability per occurrence.
In Lombard, the Supreme Court’s finding of an occurrence was based on continuous, uninterrupted or repeated exposure to the condition of pile-driving activities and not on an accident. In the case sub judice, the trial court found the members of the class were subjected to continuous or repeated exposure to carbide lime, “a byproduct derived from Air Liquide’s manufacturing of acetylene gas and its components” during the removal and transporting of the material from AL’s site. The Court further found that the class representatives’ exposure was exacerbated by the failure of the corporate defendants, AL and GL, to adhere to the Reclamation Plan (removal plan) that had been submitted to the LDEQ. Said exposure occurred between July 2004 and December 2004. AL listed carbide lime slurry in its MSDS[31] submitted to the LDEQ. The trial court stated, “Carbide Lime slurry is listed in the hazardous material identification system as Category Three, which states that it is a ‘severe acute exposure hazard: one-time overexposure can result in permanent injury and may be fatal.’” The trial court concluded that GL and AL, which were insured by the Insurance Defendants, breached the duty owed to the public when handling and transporting such a hazardous material over a period of time.
Like the pile-driving in Lombard, the repeated exposure to the hazardous material during transport from July 2004 through December 2004 constituted an occurrence under the Chartis policy language and under Lombard. Even Appellants acknowledged that it is undisputed “that there was a long-term release |4!lor discharge of dust from the Global Lime clean-up operations at the site.” In applying Lombard, the word “occurrence” is construed from the point of view of each plaintiff who was damaged from July 2004 to December 2004.
We find the trial court accurately applied Lombard and its progeny and appropriately found an occurrence to each class member involving continuous or repeated exposure to carbide lime over a period of time. It is longstanding Louisiana law that when the separate property of each plaintiff was damaged by a series of events, one occurrence was involved insofar as each property owner was concerned. See Lombard, supra. This principle must be applied in this case.

*45
THE APPLICATION OF LOMBARD AND ITS PROGENY TO CLASS ACTIONS

Included in their argument that the claims of each member of the class should be considered as a separate accident for each policy period, in which we find no merit, Appellants assert the class certification renders the application of Lombard and its progeny erroneous in this case. We find this argument is without merit.
Louisiana trial courts are afforded broad discretion in determining the class certification issues, and have wide latitude in considerations involving policy matters, and those requiring a preliminary analysis of the facts. Davis v. Am. Home Prods. Corp., 02-0942, p. 6 (La.App. 4 Cir. 3/26/03), 844 So.2d 242, 249 (Citation omitted). The Louisiana Supreme Court stated, in Brooks v. Union Pac. R.R. Co., 08-2035, p. 10 (La.5/22/09), 13 So.3d 546, 554:
The determination of whether a class action meets the requirements imposed by law involves a rigorous analysis. The trial court ‘must evaluate, quantify and weigh [the relevant factors] to determine to what extent the class action would in each instance promote or detract from the goals of effectuating substantive law, judicial |¡^efficiency, and individual fairness.’ In so doing, ‘the trial court must actively inquire into every aspect of the case and should not hesitate to require showings beyond the pleadings.’ ‘[I]f there is to be an error made, it should be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require.’ (Citations omitted).
In reviewing a trial court’s judgment regarding class certification, the trial court’s factual findings are subject to the manifest error standard; however, the trial court’s ultimate decision of whether or not to certify the class is reviewed under the abuse of discretion standard. Implicit in this deferential standard is recognition of the essentially factual basis of the certification inquiry and of the district court’s inherent power to manage and control pending litigation. Id. (Citations omitted).
The Insurance Defendants specifically assert that in the case of a class action, “the Lombard concerns regarding the lack of clear guidance on the definition of ‘occurrence’ in the multiple plaintiff context are fatally weakened because the class members’ claims have been combined into one collective claim on behalf of similarly situated individuals.” The Insurance Defendants further rationalize that until the class is decertified, the commonality finding of the trial court mandates a finding that there is a single occurrence for the collective claim of the class for each of the Chartis policy periods. We disagree.
In Davis v. Jazz Casino Co., L.L.C, 03-0005 (La.App. 4 Cir. 1/14/04), 864 So.2d 880, 885, this Court concluded that:
[ a] class action is nothing more than a procedural device. It confers no substantive rights. The purpose and intent of class action procedure is to adjudicate and obtain res judicata effect on all common issues applicable not only to the class representatives who bring the action, but to all others who are similarly situated, provided they are given adequate notice of the pending class action and do fynot timely exercise the option of exclusion there from. (Citations omitted).
A class action is merely a complex joinder device by which'pre-existing substantive rights are enforced. According to the U.S. Supreme Court, the “principal purpose” of class actions is “the efficiency and economy of litigation.” Gen. Tel. Co. *46 v. Falcon, 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (quoting Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974)). The class action device can eliminate redundancy in the judicial system and can streamline litigation. Therefore, contrary to the Insurance Defendants’ contention, a class action does not affect or “weaken” the terms of insurance policies; the terms remain the same, regardless of whether the claims were brought individually or as a class action. Furthermore, the policies at issue do not provide for any differences between claims filed by individuals or by an aggregation of individuals.
Although the Insurance Defendants ask that we distinguish between the class plaintiffs in this case and the plaintiffs in Lombard, we found no authority which would allow such a distinction. Lombard involved seventeen consolidated suits involving 119 plaintiffs. Only eight of the 119 plaintiffs testified, however, there was a stipulation in the record that set forth that if each plaintiff in all cases were to testify, each would testify substantially the same as those who testified regarding causation and damages to the property of each plaintiff. The litigation in the case before this Court was styled similarly to Lombard, with the only difference being that the claims of the plaintiffs were consolidated pre-trial and styled as a “class action.” The plaintiffs in this case were treated the same as the Lombard plaintiffs; they gained no benefits or advantages because of the consolidation of their claims.
The Insurance Defendants have provided no legal basis for this Court to 152create a mechanism by which a class of injured plaintiffs can be or should be treated differently from individual plaintiffs. Therefore, we find no merit in the Insurance Defendants’ argument that the claims that constitute the class create a significantly different context from Lombard and its progeny.

THE NON-CUMULATION PROVISIONS

Chartis and C & I assert that the trial court erroneously found that the non-cumulation coverage provisions conflict with the “exposure theory” adopted by Louisiana courts and were therefore unenforceable. We find no merit in this argument.
The exposure theory of coverage contends that an insurance policy is triggered when the claimant is first exposed to the cause of the damage. Therefore, an insured who commences an action in a jurisdiction which applies the exposure trigger would be entitled to indemnification by the insurance policy in effect when the claimant first came into contact with the injurious condition. Conversely, the expiration of the policy would not end an insurer’s obligations to cover damages that continued to occur after the initial exposure.
The following language in both C & I policies limits coverage to a single accident:
8. TWO OR MORE COVERAGE FORMS OR POLICIES ISSUED BY US
If this Coverage Form and any other Coverage form or policy issued to you by us or any company affiliated with us apply to the same “accident”, the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as | .^excess insurance over this Coverage Form. (Emphases added).
*47 The class representatives contend the trial court erroneously concluded that there was no ambiguity regarding the term “affiliated” in the C & I policy limits provision. The trial court initially agreed with the class representatives that the term was not defined in the policy, but the court found that the declaration page of the C & I policies, the other insurance companies “are clearly enumerated, and therefore, any insured would have to reasonably assume that C & I and AISLIC are affiliated.” We agree with the trial court’s assessment.
The class representatives aver the C & I policies are ambiguous with respect to the “affiliated” reference. AL additionally argues that C & I policies are ambiguous not only regarding the “affiliated” reference, but also with respect to the “same accident” reference. We disagree.
In McNamara v. Augustino Bros., 08-1522, pp. 5-6 (La.App. 4 Cir. 5/13/09), 13 So.3d 736, 740-41, this Court articulated, “It is well-settled in Louisiana jurisprudence that clear and unambiguous language limiting liability in insurance contracts should be enforced as written, provided that the language is not overly broad or against public policy. Similarly, ‘[t]he words of a contract must be given their generally prevailing meaning.’ Any ambiguities are to be construed against the insurer:
Ambiguous policy provisions generally are to be construed against the insurer and in favor of coverage. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer’s obligation are strictly construed against the insurer. That strict construction principle, however, is subject to exceptions. One of these exceptions is that the strict construction rule applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations; for the rule of strict construction to apply, the insurance 1 impolicy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable.” (Citations omitted).
The class representatives and AL, respectively, have failed to provide this Court with alternative interpretations of “affiliated” and “same accident.” Only the class representatives challenged the clarity of “affiliated” before the trial court. The record does not reflect an opposition to the term “same accident” by AL; therefore, its claim of ambiguity is not properly before this Court.
Construing the policy as a whole, we opine the term “affiliated” is defined as “closely associated with another typically in a dependent or subordinate position.”[32] We conclude the trial court’s interpretation of “affiliated” was within the common meaning, is not confusing, and is not susceptible to multiple interpretations. The term does not render the policies ambiguous.
We find the C & I policies were written on “occurrence” based forms, which means that the event or occurrence that is the subject of the class representatives’ loss must have occurred during the policy periods. The C & I policies contain only a “per occurrence” limit, not an “aggregate” limit. The “per occurrence” refers to the most the policy will pay for any one occurrence/incident, which, in this case, is $1,000,000.00 per occurrence.
Based upon this Court’s reasoning, we find that the non-cumulation/anti-stacking provision in the C & I policies are ineffective in this case because it affects nonexistent aggregate limits, not per oceur- *48 rence limits. Therefore, we affirm the trial court’s findings that the policies issued by Chartis and C & I for the July 2004 through December 2004 period are effective and shall provide primary coverage.
| ^DECREE
For the above mentioned reasons, we find that the trial court did not err by denying AL a jury trial. The trial court also did not abuse its discretion by admitting the testimony of Dr. Zegel. The record contained sufficient evidence to support a factual finding of medical causation; therefore, we do not find that the trial court committed manifest error. The trial court did not abuse its vast discretion by awarding Miss Marshall $23,000 for damages due to scarring from the carbide lime dust. Additionally, the trial court did not abuse its discretion in denying the motion to decertify the class, as no material changes in fact occurred following the previous class certifications. The trial court redefined the class definition according to evidence presented and did not commit manifest error. We also find that the trial court did not commit manifest error in finding that AL retained operational control over GL and the AL site, by imposing garde liability upon AL, or by imposing La. C.C. art. 667 liability upon AL.
Furthermore, we find the trial court accurately applied Lombard and its progeny and appropriately found an occurrence as to each class member involving continuous or repeated exposure to Carbide lime over a period of time, specifically between July 2004 and December 2004. We also find that the non-cumulation/anti-stacking provision in the C & I policies are ineffective in this case because it affects non-existent aggregate limits, not per occurrence limits. Based upon our review, we hold the policies issued by Chartis and C & I for the July 2004 through December 2004 period are effective and shall provide primary coverage.
AFFIRMED.
DYSART, J., concurs in the result.

. The National Union Fire Insurance Company was later dismissed from the proceedings with prejudice.

. The terms carbide lime and calcium hydroxide are used interchangeably throughout this Court's opinion.

. Marshall v. Air Liquide-Big Three Inc., 09-0105 (La.3/13/09), 5 So.3d 125.

. Michelle Marshall, Dorothy Jones, and Tina Andrews were all residents of the Reyne Apartment Complex. Jim Adams was an employee for the Housing Authority of New Orleans ("HANO”) who worked at the Reyne Apartment Complex.

. While referred to as the class representatives throughout this opinion, this Court is cognizant that their case represents the entire plaintiff class.

. Three C’s and its alleged insurers reached a settlement agreement prior to trial that was filed in the trial court after trial. Marshall v. Air Liquide-Big Three Inc., 11-1239, p. 2 (La.App. 4 Cir. 4/11/12), 89 So.3d 427, 428.

. The September 8, 2009 case management order provided for a jury trial pursuant to Republic’s request.

. AL mistakenly believed that the trial court signed the judgment dismissing Republic on May 11, 2010.

. The trial court’s complete reasons for judgment are contained in the record, but are not signed and dated. All parties relied upon those reasons for judgment in their respective appellate briefs. Therefore, this Court notes that the reasons for judgment contained in the record are valid.

. ACE1, ACE2, and Pacific were erroneously included in the motion, but were later removed.

.Chartis and C & I failed to brief the issues relative to the judgment setting taxable costs. Therefore, we deem the issues abandoned. See Rule 2-12.4, Uniform Rules, Courts of Appeal. See also Thomas v. Thomas, 02-1667 (La.App. 4 Cir. 3/12/03), 842 So.2d 1152; Hymel v. Halmar, Inc., 532 So.2d 851, 852 (La.App. 4th Cir. 1988).

. Chartis and C & I assert this alleged error committed by the trial court as the insurers of GL.

. This Court recognizes that the record contains numerous case management orders stating that the case will proceed as a bench trial.

.Again, as stated above, AL mistakenly believed that the trial court signed the judgment dismissing Republic on May 11, 2010.

. The record does not include documentation demonstrating that AL sought supervisory review of the trial court's second denial of its request for a jury trial. Therefore, the trial court's second denial of AL’s right to a jury trial was waived. Windham v. Sec. Ins. Co. of Hartford, 337 So.2d 577, 579 (La.App. 4th Cir.1976).

. The class representatives note that most of the medical records were destroyed by Hurricane Katrina.

. Miss Marshall’s testimony was extremely candid. She never denied any of her preexisting conditions, which included asthma, dermatitis, and HIV.

. Dr. Wilson also testified at the original class certification hearing.

. An MSDS sheet is a material safety data sheet that informs people, like employers and employees working with a certain material, the properties of the material, how to handle the material, and the risks associated with that material.

. PM-10 refers to the particle size of the carbide lime dust.

. The National Ambient Air Quality Standard is 150 micrograms per cubic meter per part PM-10.

. Mr. White was referring to the residents of the Reyne Apartment Complex.

. The trial court found that an unreasonable risk of harm was created by AL breaching its duty to the class representatives by failing to force GL to comply with the reclamation plan approved by the LDEQ and/or by failing to shutdown the AL site once GL continued the usage of tri-axle dump trucks instead of the required tanker trucks because GL decided that hydromining was too time-consuming. Coupled with our discussion regarding causation and AL’s knowledge of GL’s cost-cutting measures, we find no manifest error in this assessment. See Hutchison v. Knights of Columbus, Council No. 5747, 02-1817, pp. 4-5 (La.App. 4 Cir. 5/7/03), 847 So.2d 665, 668.

. In Tesvich, numerous fishermen holding leases from the state for oyster production filed suit claiming their oyster beds were damaged when a tugboat and barge became grounded and subsequently were removed by another tugboat. This Circuit followed Lombard and found that the claim of each plaintiff with respect to his or her leases constituted a separate occurrence.

. Soc’y of Roman Catholic Church of Diocese of Lafayette & Lake Charles, Inc. involved two pedophilic priests who molested 31 children over a period of seven years. Numerous claims were made on behalf of the children and their parents. Several insurance companies provided coverage to the plaintiff during the time period. The various insurance policies involved in the case were "occurrence” based, meaning their limits of coverage were capped on a per occurrence basis. The record did not show the number of times each child was molested or the extent of the damage resulting from each encounter. The Fifth Circuit was called upon to determine the number of occurrences present in the case in order to determine the amount of coverage provided by the various insurers. The court found the definition of "occurrence” to be somewhat uncertain and relied on Lombard for guidance. Following the reasoning of Lombard, the Fifth Circuit found that the damage to each child was a separate occurrence.

.The Fifth Circuit in Exxon Corp. found that where five crew members claimed to be damaged by fumes from sludge carried by vessels they worked on and brought suit for their alleged damages, there were five separate occurrences based upon the court's reading of Lombard.

. AISLIC is now Chartis.

. The trial court erred regarding the aggregate limits of coverage provided by the C & I policies. The C & I policies do not contain an aggregate limit of coverage. This was corrected in the trial court’s March 31, 2011 amended judgment.

. From the Commercial General Liability and Pollution Legal Liability Declarations Coverages form issued to named insured, Global Lime ÑOLA, LLC.

. From the Commercial and Industry Insurance Company’s Business Auto Declarations to named insurer, Global Lime ÑOLA, LLC.

. “Carbide lime slurry” is a liquid form of carbide lime.

. Merriam-Webster Online Dictionary.