| GIBBS CONSTRUCTION, L.L.C. | * | NO. 2019-CA-0665 |
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| NATIONAL RICE MILL, L.L.C. | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2012-12018, DIVISION "M"

Honorable Paulette R. Irons, Judge
* * * * * *
**Judge Paula A. Brown**
* * * * * *

(Court composed of Chief Judge James F. McKay, III, Judge Paula A. Brown, Judge Dale N. Atkins)

C. Michael Pfister, Jr.
Linda A. Hewlett
DUPLASS ZWAIN BOURGEOIS PFISTER & WEINSTOCK
3838 North Causeway Boulevard
2900 Three Lakeway Center
Metairie, LA 70002

      COUNSEL FOR THIRD-PARTY DEFENDANT/APPELLEE

Stephen Michael Gele'
Randall Alan Smith
Darrinisha Gray
SMITH & FAWER, L.L.C.
201 St. Charles Avenue
Suite 3702
New Orleans, LA 70170

Emile Anthony Bagneris, III
THE BAGNERIS FIRM, LLC
6305 Elysian Fields Ave, Ste. 207
New Orleans, LA 70112

      COUNSEL FOR DEFENDANTS/APPELLANT

            **REVERSED; REMANDED**
            **March 18, 2020**

PAB

JFM

DNA

This appeal arises from an insurance coverage dispute between Appellant/Defendant/Third-party Plaintiff, National Rice Mill, L.L.C. and Appellee/Third-party Defendant, Fireman's Fund Insurance Company. Rice Mill seeks review of the district court's March 12, 2019 judgment granting Fireman's Fund's motion for partial summary judgment. For the reasons that follow, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY/FACTUAL BACKGROUND

The pertinent parties involved in this litigation were succinctly set forth in *Gibbs Constr., L.L.C. v. Nat'l Rice Mill, L.L.C.*, 17-0113, pp. 1-2 (La. App. 4 Cir. 2/21/18), 238 So.3d 1033, 1036, *writ denied*, 18-0464 (La. 5/11/18), 241 So.3d 1012:

> Gibbs Construction, L.L.C. ("Gibbs") was the general contractor for an extensive renovation of the Rice Mill's luxury apartment complex, the Rice Mill Lofts (the "apartments") [in New Orleans]. Gibbs selected Rush Masonry, Inc. ("Rush") as the masonry restoration subcontractor for the renovation of the apartments.

1

Westchester issued a policy of commercial general liability ("CGL") insurance to Rush, which was the primary layer of insurance during the policy periods of February 1, 2011 to February 1, 2012 and February 1, 2012 to February 1, 2013. Third[-]Party Defendant/Appellee, Fireman's Fund Insurance Company ("Fireman's Fund") provided a policy of excess liability insurance to Rush during each of the aforementioned Westchester policy periods.

Rush began the masonry restoration work in March of 2010. In July of 2011, a severe storm occurred that caused water intrusion into the apartment complex. In September of 2011, Tropical Storm Lee struck New Orleans, resulting in a major water intrusion into the apartment complex. Rice Mill claimed it continued to experience water intrusions. Rice Mill received and documented complaints from tenants of water intrusion into their apartments from April of 2012 through August of 2012. In August of 2012, Hurricane Isaac struck, and the apartment complex suffered another major water intrusion.

In December of 2012, Gibbs filed a petition alleging Rice Mills was in breach of contract for failure to make payments due under the contract. Rice Mill filed an answer, reconventional demand, and third-party demand, a supplemental and amended reconventional demand and third-party demand, and a third amended third-party demand. In these pleadings, Rice Mill alleged that Gibbs was in breach of contract and negligent:

10.
As part of the Contract, Gibbs was to waterproof the building, including masonry replacement and repair, to certain specifications.
11.
The waterproofing, including the masonry work, was performed below standards, not in accordance with the plans and specifications, and did not provide adequate waterproofing for the building envelope.
12.
Gibbs had, and has, a continuing obligation to complete the following work, and/or make the following restorations and repairs which they have not accomplished:

2

A. waterproofing the building, including the windows; and

B. repaying and/or replacing any and all other defects in design, manufacture, construction, workmanship and/or installation be shown at the trial of this matter.

* * *

16.

Gibbs was negligent and caused National Rice Mill to suffer damages by failing to properly manage and supervise its subcontractors, as well as inspect the work performed during the construction of the project.

17.

National Rice Mill has repeatedly called upon Gibbs to complete the work to meet the plans and specifications to no avail.

18.

The incomplete and defective work of Gibbs has contributed in whole or in part to severe water intrusion into the building.

Rice Mill included as third-party defendants, Rush, Westchester, and Fireman's Fund.[1] Rice Mill asserted the defendants were liable *in solido* for damages.[2] Rice Mill settled with all of the parties except for Fireman's Fund.

In February of 2016, Fireman's Fund filed a motion for partial summary judgment arguing that two separate weather events, one on September 4, 2011, Tropical Storm Lee, and one on August 28, 2012, Hurricane Isaac, resulted in two occurrences of property damage that triggered both of Westchester's policies.[3]

---

[1] Other third-party defendants were named which are not relevant to the case *sub judice*.

[2] Rice Mill alleged the following damages:

> . . . resulting from their breaches of contract, breaches of warranty, and negligence, which consist of water intrusion damage, mold and mildew damages, termite damage, property damage, cleanup and remediation costs, cost of repair and renovation of the masonry, cost of waterproofing the building, diminution of value to the building, delay damages, costs and expenses of relocating tenants, lost rents, loss of business reputation, loss of profits and loss of business opportunity, legal interest from the date of default, reasonable attorney fees, and the costs of these proceedings.

[3] Westchester filed a motion for partial summary judgment asserting there was one occurrence—the construction defect in the masonry—that allowed the water damage to occur, triggering only one of its policies—the policy for the period of February 1, 2011 to February 1, 2012. Before

3

Fireman's Fund's motion for partial summary judgment was granted and designated as final by the district court. Rice Mill appealed, and this Court held that Fireman's Fund, in light of its failure to properly submit exhibits in support of its motion, "failed to meet its burden of proving two occurrences and was not entitled to judgment as a matter of law." *Gibbs Constr., L.L.C.*, 17-0113, p. 9, 238 So.3d at 1040.[4] As a result, the district court's ruling was reversed and the matter remanded "for proceedings consistent" with the opinion. *Id.*, 17-0113, pp. 9-10, 238 So.3d at 1040.

In February of 2018, Fireman's Fund renewed its motion for partial summary judgment and properly attached exhibits in support of its motion. In its renewed motion, Fireman's Fund requested "a ruling from [the district court] that the 2011 Westchester insurance policy was triggered and the 2012 Westchester insurance policy was triggered as a result of at least two separate instances [occurrences] of property damage to Third-Party Plaintiff, National Rice Mill's building."

Rice Mill opposed the motion and properly attached exhibits in support of its opposition. Rice Mill argued there was a single occurrence—the continuous or repeated exposure to the defective masonry restoration which resulted in water intrusions into the apartment complex causing property damage.

---

the district court could rule on the motion, Westchester entered into a settlement agreement with Rice Mill.

[4] This Court wrote that "[b]ased on our *de novo* review of the motion for summary judgment, opposition, and the exhibits attached to and properly admitted with the motion and opposition, there is not sufficient evidence before this Court 'to show that the other party lacks factual support for their position.'" *Gibbs Constr., L.L.C. v. Nat'l Rice Mill, L.L.C.*, 17-0113, p. 9, 238 So.3d at 1040.

4

After a hearing was held in October of 2018, the district court granted Fireman's Fund's motion.[5] The judgment was signed on March 12, 2019, and the district court designated the judgment as a final judgment pursuant to La. C.C.P. art. 1915(B). This appeal follows.

**DISCUSSION**

Rice Mill asserts that the district court erred in granting Fireman's Fund motion for partial summary judgment.

An appellate court's standard of review for a grant of a summary judgment is *de novo*, and it employs the same criteria that district courts consider when determining if a summary judgment is proper. *Perniciaro v. McInnis*, 18-0113, pp. 8-9 (La. App. 4 Cir. 9/7/18), 255 So.3d 1223, 1230 (citations omitted). "To affirm a summary judgment, we must find reasonable minds would inevitably conclude that the mover is entitled to judgment as a matter of the applicable law on the facts before the court." *Johnson v. Loyola Univ. of New Orleans*, 11-1785, p. 7 (La. App. 4 Cir. 8/8/12), 98 So.3d 918, 923.

Fireman's Fund's renewed motion for partial summary judgment was filed in 2018. The applicable version of La. C.C.P. art. 966 provided that "[a]fter an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3). The burden of proof was on the mover,

---

[5] At the hearing, the following pertinent exchange occurred:

[COUNSEL FOR FIREMAN'S FUND]:

Judge, whether it's one occurrence, two occurrences or ten occurrences that span two policies, you've got property damage that occurs during those policy periods and so, therefore, coverage under that policy is triggered.

THE COURT;

I agree with him. This is two occurrences.

Fireman's Fund; whereas the adverse party, Rice Mill, had the burden to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. C.C.P. art. 966(D)(1).[6]

Rice Mill argues the district court erred in concluding that there were two separate occurrences under the Westchester CGL policies. Rice Mill asserts there was a single occurrence—the "continuous and repeated water intrusions from the same harmful conditions in the masonry." In support, Rice Mill references the exhibits attached to its opposition memorandum to Fireman's Fund's motion for partial summary judgment. Rice Mill cites to a July 14, 2011 email between Wayne Troyer, the architect Rice Mill hired for the extensive renovation of the apartment complex whose specifications included the work to be performed on the masonry, and the superintendent for Gibbs; this email discussed a water intrusion through the exterior brick of the apartment complex which occurred during a rain storm on July 11, 2011. Rice Mill references excerpts of Mr. Troyer's deposition taken on September 30, 2014, and October 1, 2014, respectively, wherein Mr. Troyer was of the opinion that the water intrusions were a result of the defective masonry restoration.[7] In addition, Rice Mill points out an excerpt of the deposition

---

[6] La. C.C.P. art. 966 (D)(1) provides that "[i]f the mover will not bear the burden of proof at trial on the issue that is before the court on the motion for summary judgment, the mover's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense."

[7] In the October 1, 2014 deposition, Mr. Troyer opined:

> Q Okay. And I just had a question in regard to -- you were asked about the source of water intrusion this morning with regard to the Tropical Storm Lee.
> A Uh-huh.
> Q And I have that you responded that your opinion was the source of the water coming in was the lack of the tuckpointing and through cracks and voids in the brick. Would those sources also be the same for Isaac?

6

of Sean Cummings, owner of Rice Mill, wherein Mr. Cummings stated that there were water intrusions in addition to those that occurred during Tropical Storm Lee and Hurricane Isaac. Notwithstanding, Mr. Cummings acknowledged that the invoices, provided in discovery as proof of damages suffered, were designated under the two major storms. Also, Rice Mill iterates that it received tenants' emails from February, April, May, June, July, and August of 2012 notifying Rice Mill's management of water intrusions in their apartments.[8] Furthermore, Rice Mill contends the property damage that occurred under the Westchester 2011-2012 CGL policy was continuous and repeated exposure; thus, *all* the proven property damages in which Rush would be liable are covered under the 2011-2012 policy. In the alternative, Rice Mill contends there is a genuine issue of material fact as to the occurrences.

In contrast, Fireman's Fund asserts the district court was correct in finding there were two occurrences, one under each of Westchester's policies. In support, Fireman's Fund argues four grounds and references the following exhibits attached to its renewed motion:

---

A Yes.
Q And those sources of water intrusion pre-existed Tropical Storm Lee; is that correct?
A Yes.
Q And those same sources, the tuckpointing cracks, voids, pre-existed Hurricane Isaac also, correct?

* * *

A Correct.

[8] The affidavit of Anthony J. Larocci, a managing member of Rice Mill, was also attached to Rice Mill's opposition memorandum. In the affidavit, Mr. Larocci attested that the tenant's emails were "records made and kept in the course of a regularly conducted business activity of National Rice Mill, L.L.C.," and "[i]t was the regular practice of National Rice Mill, L.L.C. for an employee or representative to make or keep a record of emails sent by tenants."

A. Certified copy of the policy of Westchester, insuring Rush Masonry, effective 2/1/11- 2/1/12.

B. Certified copy of the policy of Westchester, insuring Rush Masonry, effective 2/1/12- 2/1/13.

C. National Rice Mill's Initial Disclosures, authenticated by Sean Cummings in his 3/27/15 deposition on p. 45 as Exhibit 158, attached in globo;

D. National Rice Mill's Memorandum in Opposition to Gibbs Construction's Motion for Summary Judgment on Consequential Damages and Delay Damages.

E. National Rice Mill's Responses to R.K. Holmes' Third Set of Interrogatories, authenticated by Sean Cummings in his deposition 3/27/15 on p. 68-72, attached in globo.

First, Fireman's Fund points out that Rice Mill produced invoices of the costs incurred due to the property damage, and the invoices were labeled by each storm. The Tropical Storm Lee invoice totaled $111,937.29, and the Hurricane Isaac invoice totaled $597,078.07. Second, Fireman's Fund emphasizes Rice Mill's allegation "that the damage to the National Rice Mill Lofts was caused by water infiltrating (primarily during Tropical Storm Lee and [Hurricane] Isaac) the building through the masonry."[9] Third, Fireman's Fund asserts that Rice Mill experienced property damage in 2011 and then again in 2012, and Rice Mill remediated its building twice after each weather event;[10] thus, these two events triggered Westchester's 2011-2012 and 2012-2013 CGL policies. Fourth, Fireman's Fund contends that both Westchester policies specify that "'[w]e will pay those sums that the insured becomes legally obligated to pay as damages

---

[9] As set forth *supra*, at the hearing on the motion for partial summary judgment, counsel for Fireman's Fund argued whether it was one occurrence or ten occurrences, the occurrences spanned the two policies, thus, coverage under both polices was triggered.

[10] Southeast Waterproofing, Inc., was hired by Rice Mill, in May of 2012, to apply a water repellant to the masonry; it began the masonry work in June of 2012, which was completed in July of 2012. In May of 2013, Rice Mill hired Frontier to waterproof the masonry and Frontier completed its work in October of 2013.

because of . . . 'property damage' to which this insurance applies,'" and this coverage applies to "'property damage'" that occurs during the policy period. In the alternative, Fireman's Fund contends, if only the Westchester 2011-2012 CGL policy is triggered, only those proven property damages sustained during the policy period are covered.

Our review of the evidence admitted for purposes of the motion for partial summary judgment shows that there is no genuine issue as to material fact; thus, the question is whether Fireman's Fund proved it was entitled to partial summary judgment as a matter of law. As a result, this case necessitates the interpretation of an insurance policy.

### APPLICABLE LAW

In *Perniciaro*, 18-0113, p. 9, 255 So.3d 1223, 1231, *writ denied*, 18-1659 (La. 12/17/18), 259 So.3d 342 (quoting *Thebault v. Am. Home Assur. Co.*, 15-0800, p. 5 (La. App. 4 Cir. 4/20/16), 195 So.3d 113, 116), this Court explained that "'[i]nterpretation of an insurance policy usually involves a legal question that can be resolved properly within the framework of a motion for summary judgment.'" When called on to interpret an insurance policy, the general rules of interpretation of contracts set forth in the Louisiana Civil Code should be utilized by the court as an insurance policy is a contract between the parties. *Id.*, 18-0113, pp. 9-10, 255 So.3d at 1231 (citation omitted). The extent of coverage is determined by "'[t]he parties' intent as reflected by the words in the policy,'" and "'[s]uch intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the policy, unless the words have acquired a technical meaning.'" *Id.*, 18-0113, p. 10, 255 So.3d at 1231

(quoting *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So.2d 759, 763 (La. 1994)). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046. Moreover, "[c]ourts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." *Cadwallader v. Allstate Ins. Co.*, 02-1637, p. 4 (La. 6/27/03), 848 So.2d 577, 580 (citations omitted). The determination of whether a contract is clear or ambiguous is a question of law. *Id.*

With these principles of law in mind, we turn to language of the policies.

## *INTERPRETATION OF THE INSURANCE POLICY*

Fireman's Fund is the excess carrier of Westchester, and Westchester provided a CGL policy for Rush. CGL insurance protects the insured against liability for damages the insured's operations cause to property other than the insureds' work product.[11] In the case *sub judice*, Westchester issued to Rush two CGL policies that were occurrence policies for the period of February 1, 2011 to February 1, 2012, and February 1, 2012 to February 1, 2013. The policies contained similar language. Both policies provided that "[Westchester] will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The policy pertinently provided:

---

[11] Louisiana Practice Series, § 6:2.Comprehensive [now referred to as "Commercial"] General Liability (CGL) policy.

10

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. Insuring Agreement

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. . . .

* * *

    b. This insurance applies to . . . "property damage" only if:
        (1) The . . . "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
        (2) The . . . "property damage" occurs during the policy period.

* * *

    c. "[P]roperty damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that . . ."property damage" after the end of the policy period.

The policy defined "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it . . . ."

"Occurrence" was defined in both polices as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The limits of each policy were $1,000,000.00 for each "occurrence," a general aggregate limit of $2,000,000.000, and a deductible of $5,000.00 per occurrence.

In effecting our *de novo* review of the district court's granting of Fireman's Fund's motion for partial summary judgment, we must examine: (1) what was the "Occurrence;" (2) whether there was a single or two occurrences; and (3) what policy or policies were triggered.

*"Occurrence"*

"Occurrence" is defined in both polices as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In *Rando v. Top Notch Props.*, 03-1800, pp. 7, 18 (La. App. 4 Cir. 6/2/04), 879 So.2d 821, 827, 834, this Court, in interrupting the meaning of "Occurrence"[12] in a CGL policy defined the same as in the Westchester policies, concluded that "the clear weight of authority [Louisiana jurisprudence] in more recent cases considers defects in construction that result in damage subsequent to completion to be accidents and occurrences when they manifest themselves." *See also*, *Iberia Par. Sch. Bd. v. Sandifer & Son Const. Co.*, 98-319 (La. App. 3 Cir. 10/28/98), 721 So.2d 1021 (wherein the Third Circuit interpreted "Occurrence," defined similarly in a CGL policy as the current polices, as an "'accident, including continuous or repeated exposure to same general harmful conditions.'" The Court concluded the alleged improper construction of the roof that resulted in numerous leaks was an "accident or 'occurrence.'"); *Massey v. Parker*, 98-1497, pp. 3-4 (La. App. 3 Cir. 3/3/99), 733 So.2d 74, 75 (defects in home construction constituted an occurrence).[13]

---

[12] The policy at issue in *Rando* defined "Occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id*.

[13] In *Atain Specialty Ins. Co. v. Siegen 7 Developments, L.L.C.,* No. CV 18-00850, 2019 WL 4247827, at *4 (M.D. La. Sept. 6, 2019), the federal district court, in interrupting "Occurrence" in a CGL policy defined as in the Westchester policy, noted:

> Louisiana courts interpret "occurrence" to include "an unforeseen and unexpected loss." *North Amer. Treat. Sys. v. Scottsdale Ins.*, No. 2005-0081 (La. App. 1 Cir. 10/25/06), 943 So.2d 429, 444; *see also Cunard Line Ltd. Co. v. Datrex, Inc.*, No. 09-656 (La. App. 3 Cir. 12/9/09), 26 So.3d 886, 890-91 (affirming trial court's determination that "the property damage caused by the defective work and/or defective products is an occurrence or accident which triggers coverage under the terms of the insurance policies"). Such a loss can arise out of faulty construction. *Iberia Parish Sch. Bd. v. Sandifer & Son Constr. Co.*, No. 98-319 (La. App. 3 Cir.

Review of the record shows that Rice Mill submitted evidence to show that the alleged defective masonry restoration was the "Occurrence" as defined by the Westchester CGL policies. Conversely, Fireman's Fund submitted no evidence to refute Rice Mill's contention that the alleged defective masonry restoration was the "Occurrence." Thus, based on our *de novo* review, and the unambiguous language of the Westchester CGL policies, we conclude that the "Occurrence" was the alleged defective masonry restoration.

*Single vs. two occurrences*

Rice Mill asserts there was a single occurrence which was the continuous or repeated exposure to the defective masonry restoration; whereas, Fireman's Fund contends there were two occurrences—Tropical Storm Lee, which occurred during the Westchester 2011-2012 CGL policy, and Hurricane Isaac, which occurred during the Westchester 2012-2013 CGL policies.

Although there are no cases directly on point, there were several cases from this Court we reviewed for guidance on this issue.

In *Lombard v. Sewerage and Water Board of New Orleans,* 284 So.2d 905 (La. 1973), which is cited by both parties in support, over one-hundred plaintiffs sought to recover damages from the City of New Orleans (the "City"), the City's CGL insurer, Travelers Insurance Company, the Sewerage and Water Board, and Boh Brothers Construction Company, Inc. The City hired Boh Brothers to do a canal construction project, which lasted for more than a year. Travelers issued two CGL policies to the City which were in effect during the construction project. The

10/28/98), 721 So.2d 1021, 1023 ("If the roof leaks or the wall collapses, the resulting property damage triggers coverage under an 'occurrence' basis policy, even if the sole cause is improper construction and the only damage is to the work performed by the contractor.")(quoting 1 William S. McKenzie and H. Alston Johnson III, INSURANCE LAW AND PRACTICE § 183, 15 La. Civ. Law Treat.).

plaintiffs claimed various forms of property damage to their houses, school buildings, a business, and a church caused by excavation, pile driving, and other activities carried on during the course of the construction project. Because the construction progressed from street to street, plaintiffs were not impacted necessarily at the same time; plaintiffs, whose streets were not under construction were not impacted until construction began on their streets. Travelers Insurance Company asserted there was a single occurrence and each $50,000.00 policy limit was applicable,[14] and the trial court agreed. The Supreme Court, however, reversed the trial court explaining that the word "Occurrence" as used in the policy must be construed from the point of view of the many persons whose property was damaged. The Supreme Court found that when the separate property of *each* plaintiff was damaged by a series of events—i.e. plaintiffs sustaining property damage on different streets, some at the same and some at different times, in varying degrees, during different policy periods—one occurrence was involved insofar as each property owner was concerned. The Supreme Court explained:

> [T]he construction started at Florida Avenue and proceeded down Louisa Street in the direction of Claiborne Avenue and the River. On May 25, 1963, the date the second Travelers policy became effective and the first one terminated, work had progressed as far as the intersection of Louisa and North Tonti Streets. This means the construction work had progressed four blocks, and obviously could only effect the owners of property within that area of the job. The buildings affected are those in the 2300, 2400, 2500 and 2600 blocks of Louisa Street; and, of course, all claims for damage on cross streets

---

[14] The Travelers' policies provided:

> Occurrence means either an accident or a continuous or repeated exposure to conditions which results during the policy period in injury to person or real or tangible property which is accidentally caused. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Lombard*, 284 So.2d at 915.

within that area. The remaining plaintiffs would necessarily fall under the terms of the second Travelers policy effective May 25, 1963. As our finding of fact shows, this job began on December 4, 1962 and was accepted as completed in March 1964.

*Lombard*, 284 So.2d at 915. *See also*, *Marshall v. Air Liquide-Big Three, Inc.*, 11-0990 (La. App. 4 Cir. 9/7/12), 107 So.3d 13, 42, *decision clarified on reh'g* (Oct. 5, 2012) (citations omitted) (wherein plaintiffs, who lived near an acetylene manufacturing facility and were exposed to carbide lime over a five-month period, filed a class action suit, and this Court held, following *Lombard*, "[i]t is longstanding Louisiana law that when the separate property of each plaintiff was damaged by a series of events, one occurrence[15] was involved as far as each property owner was concerned.") *Id*., 11-0990, p. 49, 107 So.3d at 44.

In *Thebault v. Am. Home Assur. Co.*, 15-0800 (La. App. 4 Cir. 4/20/16), 195 So.3d 113, Touro Infirmary contracted with Aggreko to provide a generator and an external fuel tank to give emergency power to the cooling system for the first three floors of the hospital. Aggreko delivered the generator and fuel tank shortly before Hurricane Katrina made landfall. Touro maintained that the tank was not full of fuel as required by the contract, the hospital lost power at 3:00 a.m. on August 29, 2005, and the Aggreko generator failed within hours of being put into service. The plaintiff, father of a premature baby who was exposed to "unreasonably dangerous" heat and humidity due to the power loss, filed suit and included Aggreko and American Home, Aggreko's commercial general liability insurer, as defendants. *Id*., 15-0800, p. 2, 195 So.3d at 115. Forty-one other similar but separate lawsuits were pending against Aggreko and American Home stemming from the loss of power. American Home filed a motion for partial summary

---

[15] "Occurrence" was defined in CGL policy the same as in the Westchester CGL policies.

judgment seeking a declaration that Aggreko, as the insured, was responsible for a separate $50,000.00 per occurrence retained limit for each plaintiff with similar lawsuits pending against Touro. American Home argued that the plaintiffs in the separate actions each experienced different exposures to the alleged heat and humidity, over different periods of time, and in different locations within the building. Aggreko, in turn, argued it should be a single $50,000.00 retained limit because the claims of the various plaintiffs arose out of a single occurrence—the loss of power. The trial court granted American Home's motion for partial summary judgment. On appeal, this Court reversed and concluded there was a single "occurrence" under the policy.[16] In distinguishing *Lombard*, 284 So.2d 905, this Court noted:

> The loss of power (or failure of the generator) in this case constituted a single occurrence, not a series of events occurring over time. *Thus, the term occurrence is not determined from the perspective of each plaintiff's individual damages, but rather, from the manner in which it is defined in the policy.*"

*Id*., 15-0800, p. 8, 195 So.3d at 118 (emphasis added).

In the case *sub judice*, unlike *Lombard*, there was a single plaintiff and a single "Occurrence," as defined by the Westchester CGL policy, which was the continuous or repeated exposure to the alleged defective masonry restoration that resulted in property damage to the apartment complex.

*Applicable policy*

---

[16] Under the pertinent policy, "occurrence" was used as "[t]he 'Retained Limit', applying only to damages for 'occurrences' or offenses covered under this policy, is $50,000 per 'occurrence' or offense. . . . [t]he sum of all damages under Coverage A and medical expenses under Coverage C, because of all 'bodily injury' and 'property damage' arising out of any one occurrence." *Id*., 15-0800, pp. 4-5, 195 So.3d at 116.

16

Having determined there was a single occurrence, we find the Westchester 2011-2012 CGL policy was triggered as the parties agree that the first water intrusion occurred in 2011.[17] The Westchester 2011-2012 CGL policy pertinently provided that Westchester would pay property damage to Rush, it was "legally obligated to pay as damages because of . . . 'property damage,'" if the "'property damage' occurs during the policy period," and "includes any continuation, change or resumption of that . . . 'property damage' after the end of the policy period." *See Marshall*, 11-0990, p. 54, 107 So.3d at 47 (wherein this Court held that the policies at issue were "occurrence" based forms which meant the loss must have occurred during the policy period).

Based on our *de novo* review, the unambiguous language of the policies, and applicable jurisprudence, we conclude that there was a single occurrence that triggered coverage under the Westchester CGL 2011-2012 policy. Thus, the district court erred in granting Fireman's Fund's motion for partial summary judgment.

*Property damages*

---

[17] In La. Civ. L. Treatise, Insurance Law & Practice § 6:5 (4th ed.)(footnotes omitted), discusses coverage of construction defects in an occurrence policy with language similar to the present case:

> Under Louisiana jurisprudence, the "accident" is the negligent act or omission or other fault that caused the loss. The policy, however, is quite clear that the "accident" is not the event that triggers coverage. Instead, Subsection b(2) ["' property damage' occurs during the policy period"] requires that the "property damage" occur within the policy period. "Property damage" is a defined term that includes primarily "physical injury to tangible property." Thus, the contractor's CGL policy is triggered if the construction defect causes "property damage" during the policy term—that is, causes "physical injury to tangible property." The defective construction itself does not trigger coverage under the CGL policy. Instead, coverage is triggered under the CGL policy in effect when that defect causes physical injury to tangible property (e.g., the roof leaks or the wall collapses). When the physical injury occurred is a factual and legal issue.

Rice Mill asserts all the property damages it suffered would be covered under the Westchester 2011-2012 CGL policy; whereas, Fireman's Fund contends, if the Westchester 2011-2012 CGL policy is triggered, only those proven property damages sustained during the policy period are covered. However, this issue is not properly before this Court as Fireman's Fund limited its motion for partial summary judgment filed in the district court to whether there were two occurrences triggering both policies. *See* La. C.C.P. art. 966 (F) ("A summary judgment may be rendered or affirmed only as to those issues set forth in the motion under consideration by the court at that time.").

## CONCLUSION

For the foregoing reasons, the district court's judgment is reversed and the matter is remanded to the district court for further proceedings consistent with this opinion.

**REVERSED; REMANDED.**